**MULTI–STATE COMMUNICATIONS, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**RKO General, Inc., Intervenor.**

**Nos. 83–1296, 83–1325.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 7, 1983.

Decided March 6, 1984.

Joseph M. Morrissey, Washington, D.C., with whom Edward P. Morgan, Charles A. McNelis, Kevin T. Maroney, and Robert T. Murphy, Washington, D.C., were on brief, for appellant.

Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, Washington, D.C., with whom Bruce E. Fein, General Counsel, and Sue Ann Preskill, Counsel, Federal Communications Commission, Washington, D.C., were on brief, for appellee. L. Andrew Tollin, Atty., Federal Communications Commission, Washington, D.C., also entered an appearance for appellee.

J. Roger Wollenberg, Washington, D.C., with whom Joel Rosenbloom, Thomas F. Connell, Bruce D. Ryan, Harold David Cohen, William H. Fitz, Jack N. Goodman, and Kevin R. Barry, Washington, D.C., were on the brief, for intervenor RKO General, Inc.

Before WRIGHT and TAMM, Circuit Judges, and LUTHER M. SWYGERT,* Senior Circuit Judge for the Seventh Circuit.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

Appellant, Multi-State Communications, Inc. (Multi-State), challenges two orders of the Federal Communications Commission (Commission). The first order reallocated television Channel 9 from New York to New Jersey and granted, without a comparative hearing, a five-year license to operate Channel 9 to Intervenor RKO General, Inc. (RKO). 53 Rad.Reg.2d (P & F) 469 (1983). The second order dismissed as moot Multi-State's competing application for a license to operate Channel 9. 53 Rad.Reg.2d (P &

---

* Sitting by designation pursuant to Title 28    U.S.C. § 294(d) (1976).

F) 671 (1983). Multi-State contends that these orders misconstrued section 331 of the Communications Act of 1934, 47 U.S.C.A. § 331 (West Supp.1983), and violated Multi-State's constitutional rights. For reasons expressed below, we affirm the Commission's orders.

### I. BACKGROUND

In 1972, RKO filed an application to renew its license to operate WOR–TV, a commercial television station on very high frequency (VHF) Channel 9 in New York City.[1] Shortly thereafter, Multi-State challenged RKO's renewal request by filing a competing application to operate Channel 9. Because the competing applications were mutually exclusive, the Commission ordered a comparative hearing to determine which applicant was better qualified to be licensee of the New York station. *RKO General, Inc. (WOR–TV),* 46 F.C.C.2d 246 (1974).

At the comparative hearing, the Commission indicated that it would examine six financial and character qualification issues. 46 F.C.C.2d at 250. Three of these issues were identical to issues already under consideration in another proceeding involving an application by RKO to renew its license to operate a Boston television station. *Id.* at 248–49. To avoid duplication, the Commission stated that its findings on the three common issues under consideration in the Boston proceeding would be res judicata on RKO's renewal request for the Channel 9 license. *Id.* at 249.

In the Boston proceeding, the Commission found that RKO lacked the requisite character qualifications for renewal of its Boston license. *RKO General, Inc. (WNAC–TV),* 78 F.C.C.2d 1 (1980), *aff'd,* 670 F.2d 215 (D.C.Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 (1982). Because this finding was res judicata on RKO's renewal request for the Channel 9

license, the Commission denied renewal of RKO's license for Channel 9 in New York. *RKO General, Inc. (WOR–TV),* 78 F.C.C.2d 357, 358 (1980). On December 4, 1981, this court reversed and remanded the Commission's decision regarding the Channel 9 license on the ground that the Commission had not provided a "principled explanation" for disqualifying RKO as the licensee of Channel 9.[2] *RKO General, Inc. v. FCC,* 670 F.2d 215, 237 (D.C.Cir.1981), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2931, 73 L.Ed.2d 1331 (1982).

During the course of these administrative and judicial proceedings, Congressmen from New Jersey introduced legislation to secure a commercial VHF television station for their state. These efforts included a bill proposed in July 1982 by Senator Bradley of New Jersey that would require the Commission to issue a license to any existing licensee that volunteered to move to an unserved state.[3] Senator Bradley's bill became law on September 3, 1982, and stated:

It shall be the policy of the Federal Communications Commission to allocate channels for very high frequency commercial television broadcasting in a manner which ensures that not less than one such channel shall be allocated to each State, if technically feasible. In any case in which [a] licensee of a very high frequency commercial television broadcast station notifies the Commission to the effect that such licensee will agree to the reallocation of its channel to a community within a State in which there is allocated no very high frequency commercial television broadcast channel at the time [of] such notification, the Commission shall, notwithstanding any other provision of law, order such reallocation and issue a license to such licensee for that purpose pursuant to such notification for a term of not to exceed 5 years as provided in

---

1. RKO has been the licensee of VHF Channel 9 in New York City since 1952.

2. Specifically, this court stated that "[e]ach of RKO's renewal applications arises in different contexts and presents different levels of complexity.... [WOR–TV in New York is] entitled to an opportunity to appear directly before

the Commission and to argue that [it] deserve[s] different treatment than RKO's Boston station." 670 F.2d at 237.

3. Senator Bradley's bill was appended as section 355 to the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324 (1982).

Section 307(d) of the Communications Act of 1934.

47 U.S.C.A. § 331 [hereinafter cited as section 331].

On September 7, 1982, while its license renewal application was still pending, RKO notified the Commission that it agreed, pursuant to section 331, "to the reallocation of Channel 9 from New York, New York, to Secaucus, New Jersey, upon issuance by the Commission to RKO of a regular license ... having a term of five years." Joint Appendix (J.A.) at 62. The Commission determined that a reallocation pursuant to section 331 should not be followed by a comparative hearing proceeding:

> [Section 331] specifically says that, upon notification by a licensee of its agreement to reallocate its channel to an unserved State, "the Commission shall, *notwithstanding any other provision of law,* order such reallocation and issue a license to such licensee" for a term of up to five years. The emphasized language, in our view, includes those statutory and regulatory provisions pertaining to comparative proceedings.

53 Rad.Reg.2d at 471, J.A. at 3. Accordingly, the Commission ordered the reallocation and granted RKO a five-year license. 53 Rad.Reg.2d (P & F) 469 (1983), J.A. at 1. In a companion order, the Commission dismissed as moot Multi-State's competing application for the Channel 9 license. 53 Rad. Reg.2d (P & F) 671 (1983), J.A. at 19.

This appeal followed, in which Multi-State contends that the Commission's orders misconstrued section 331 and violated Multi-State's constitutional rights.

## II. ANALYSIS

### A. *The Application of Section 331 to New Jersey*

■ Multi-State first argues that the Commission erred in reallocating Channel 9 to New Jersey because section 331 is, by its express terms, not applicable to New Jersey. Section 331 applies only to situations where an existing licensee volunteers to move its channel to "a State in which there

is *allocated* no [VHF] commercial broadcast channel ...." 47 U.S.C.A. § 331 (emphasis added). Multi-State contends that the term "allocated" is synonymous with the term "assigned." In 1952, the Commission assigned Channel 13 to Newark, New Jersey, as a VHF commercial station. *Television Assignments—Sixth Report and Order,* 41 F.C.C. 148, 258–59 (1952).[4] Because Channel 13 continues to be assigned to New Jersey in the Commission's Table of Assignments, 47 C.F.R. § 73.606(b) (1982), Multi-State argues that New Jersey plainly is outside the scope of section 331.

At first glance, Multi-State's construction of "allocated" has some appeal. Construing a statutory term, however, requires more than a superficial and isolated examination of the statute's plain words. Ascertaining congressional intent requires us to examine "the context in which statutory words are set—the statute's purpose, structure, and history ...." *Natural Resources Defense Council, Inc. v. EPA,* 725 F.2d 761 at 769 (D.C.Cir.1984). *See also FBI v. Abramson,* 456 U.S. 615, 625 & n. 7, 102 S.Ct. 2054, 2061 & n. 7, 72 L.Ed.2d 376 (1982). Our understanding of the purpose of section 331 and our examination of its legislative history compel us to reject Multi-State's construction of the term "allocated."

We first observe that although New Jersey was assigned Channel 13 in 1952, the Commission in 1961 approved the transfer of that channel's license from a commercial operator in New Jersey to a noncommercial operator in New York. *NTA Television Broadcasting Corp.,* 44 F.C.C. 2563 (1961). Since 1961, Channel 13 has been operated as part of the New York state educational network. 53 Rad.Reg.2d at 470 n. 2, J.A. at 2 n. 2. Thus, prior to the enactment of section 331, New Jersey had been without an operating VHF commercial television station for more than twenty years. The absence of such a station resulted in dissatisfied television viewers in New Jersey due to incomplete coverage of local events. *See, e.g., Petition for Inquiry Into the Need for Adequate Television Service for the*

---

**4.** Television channels are assigned to communities in rulemaking proceedings, resulting in a

Table of Assignments found at 47 C.F.R. § 73.606(b) (1982).

*State of New Jersey,* 58 F.C.C.2d 790 (1976); *Second Report and Order,* 59 F.C.C.2d 1386 (1976); *Third Report and Order,* 62 F.C.C.2d 604 (1976).

Consequently, New Jersey Congressmen introduced legislation in an effort to secure a VHF station for their state.[5] On March 31, 1982, Senator Bradley of New Jersey introduced a bill that was identical in language to section 331.[6] 128 Cong.Rec. S3160 (daily ed. Mar. 31, 1982). When introducing this bill, Senator Bradley emphasized New Jersey's need for a VHF commercial television station.[7] *Id.* He said that this bill would solve New Jersey's problem because it

> directed [the Commission] to accept and grant the application of any current license holder who voluntarily requests to have its commercial VHF TV license moved to a State which does not have one. . . . It is my hope that with the barriers to a voluntary resolution to New Jersey's problem removed, a New York station owner will step forward to move to New Jersey.

*Id.* Although the Senate adopted Senator Bradley's bill, it was appended to another bill that did not become law.

Senator Bradley therefore introduced the same bill again on July 22, 1982. 128 Cong. Rec. S8922 (daily ed. July 22, 1982). The Bradley bill again passed the Senate and this time was added to the Tax Equity and Fiscal Responsibility Act of 1982. This bill,

with the Bradley amendment, was referred to a House-Senate conference committee.[8] The conference committee retained the Bradley amendment and reported on the amendment as follows:

> New Jersey and Delaware are the only two States that do not have a commercial VHF television station. The [Bradley] amendment affirms the congressional intent that it is in the public interest for every State to have at least one VHF television station. In order to implement that intent, the amendment provides that, upon notice by any licensee in another State that it agrees to the reallocation of its channel to a community in a State in which there is no such channel, the Federal Communications Commission shall order the reallocation and issue a license to the licensee for such purpose.
>
> This provision will remove impediments which currently discourage a licensee in a State which has more than one VHF television station from voluntarily moving to a State which has none. It is the intention of Congress that any current licensee which exercises the option of seeking the transfer of its license to an unserved State . . . will . . . operate for the public benefit of the unserved State.

H.R.Rep. No. 760, 97th Cong., 2d Sess. 690 (1982); S.Rep. No. 530, 97th Cong., 2d Sess. 690 (1982), U.S.Code Cong. & Admin.News 1982, pp. 781, 1453. The conference report was adopted by both Houses on August 19,

---

5.  S.1629, Sen. Amendment No. 868, 97th Cong., 2d Sess. (1982) (Sen. Bradley, D–N.J.); H.R. 4961, Sen. Amendment No. 1124, 97th Cong., 2d Sess. (1982) (Sen. Bradley, D–N.J.); H.R. 2128, 97th Cong., 1st Sess. (1981) (Rep. Guarini, D–N.J.); S.1377, Amendment No. 202, 97th Cong., 1st Sess. (1981) (Sen. Bradley, D–N.J.); H.R. 7311, 96th Cong., 2d Sess. (1980) (Rep. Maguire, D–N.J.); H.R. 11,936, 95th Cong., 2d Sess. (1978) (Rep. Maguire, D–N.J.); S.2853, 95th Cong., 2d Sess. (1978) (Sen. Case, R–N.J. & Sen. Williams, D–N.J.).

6.  Significantly, RKO earlier had announced its willingness to move from New York to New Jersey if it were issued a new license for VHF Channel 9. Reply Comments of RKO, BC Docket No. 80–719 at 2 (July 20, 1981), J.A. at 50. Senator Bradley was aware of RKO's announcement when he introduced his bill. 127 Cong.Rec. S11,136 (daily ed. Oct. 6, 1981).

7.  Senator Bradley said:

    On several occasions, I have stood on this floor to explain . . . how important this issue is to the people of my State. Unfortunately, half of the State learns about New Jersey primarily from the perspective of New York and the other half of the State sees New Jersey from the eyes of Philadelphia.

    128 Cong.Rec. S3160 (daily ed. Mar. 31, 1982).

8.  On August 5, 1982, eight Congressmen wrote a letter to each member of the conference committee urging retention of the Bradley amendment. The letters stated that the effect of the amendment "is that WOR–TV in New York will be able to move to New Jersey and have its license reallocated there." Letter of Congressman John F. Seiberling, *et al.,* to Congressman John Dingell, Chairman, House Energy and Commerce Committee (Aug. 5, 1982), J.A. at 86.

1982,[9] and Senator Bradley's bill became law on September 3, 1982.

The frequent references to New Jersey make it clear that the sponsor and proponents of section 331 intended New Jersey to be within the statute's scope. More importantly, the conference report illustrates beyond cavil that Congress intended section 331 to apply to New Jersey. The conferees expressly noted that "New Jersey and Delaware are the only two States that do not have a commercial VHF television station. [Section 331 affirms and implements] the congressional intent ... for every State to have at least one [such] station." H.R.Rep. No. 760, 97th Cong., 2d Sess. 690 (1982); S.Rep. No. 530, 97th Cong., 2d Sess. 690 (1982), U.S.Code Cong. & Admin.News 1982, p. 1453. The conferees thus clearly contemplated New Jersey as being within the ambit of section 331 notwithstanding that New Jersey already was assigned a VHF commercial channel. The conference report, viewed against the backdrop of five years of legislative efforts by New Jersey Congressmen to secure a VHF station for their state, reveals that the purpose of section 331 is to provide each "unserved" state with an *operating* VHF commercial television station. *Id.* Accordingly, we must reject Multi-State's invitation to construe "allocated" synonymously with "assigned," because such a construction would ignore congressional intent and thwart the legislative will. *See Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975).

B. *The Commission's Grant of the License to RKO*

■ Multi-State next argues that RKO is not a "licensee" within the meaning of section 331 in light of the Commission's earlier disqualification of RKO as the licensee of Channel 9. *See* 78 F.C.C.2d 357 (1980).

Contrary to Multi-State's assertion, we find that RKO's earlier disqualification did not destroy its status as a licensee. When RKO volunteered to move from New York to New Jersey pursuant to section 331, RKO was the licensee of Channel 9. Although RKO's application for renewal of its license was before the Commission on remand from this court, *RKO General, Inc. v. FCC,* 670 F.2d 215 (D.C.Cir.1981), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2931, 73 L.Ed.2d 1331 (1982), RKO's status as a licensee during the pendency of the renewal proceeding was unaltered. *See* 5 U.S.C. § 558(c) (1982) (when a licensee applies for renewal, the license will not expire until the application has been finally determined by the agency); 47 U.S.C. § 307(d) (Supp. V 1981) (pending a final decision on a license renewal application, the Commission shall continue such license in effect).

■ Multi-State also contends that the Communications Act of 1934, 47 U.S.C. § 307 (1976 & Supp. V 1981), mandates that the Commission conduct a comparative hearing to determine which of two or more competing license applicants would better serve the public interest. Multi-State therefore argues that the Commission erred in not conducting a comparative hearing for RKO and Multi-State with respect to Channel 9. We find no error in the Commission's decision to proceed without the comparative hearing. The plain language of section 331 commands that if any licensee volunteers to move to an unserved state, "the Commission *shall,* notwithstanding any other provision of law, *order such reallocation and issue a license ....* " 47 U.S.C.A. § 331 (emphasis added). *See Boyden v. Commissioner of Patents,* 441 F.2d 1041, 1043 n. 3 (D.C.Cir.) ("'[s]hall' is the language of command"), *cert. denied,* 404 U.S. 842, 92 S.Ct. 139, 30 L.Ed.2d 77 (1971). The

**9.** On the eve of the Senate's consideration of the conference report, Senator Bradley continued to emphasize that enactment of his bill would result in a VHF commercial television station for New Jersey:

With the enactment of tonight's legislation, New Jersey will no longer be one of only two States in the country which has no VHF commercial television station.... One station has already expressed a desire to move

to New Jersey.... [T]he reallocation of a license to New Jersey will mean that the licenseholder will move its studios and offices to New Jersey and operate in New Jersey for the benefit of the people in our State.... This station will not be a New Jersey station in name only. It will serve the people of New Jersey.
128 Cong.Rec. S10,946 (Aug. 19, 1982), J.A. at 99.

Commission thus complied with the plain language of the statute.

Furthermore, the phrase, "notwithstanding any other provision of law" overrides any prior, inconsistent provision of the Communications Act. *See New Jersey Air National Guard v. FLRA,* 677 F.2d 276, 283 (3d Cir.), *cert. denied,* 459 U.S. 988, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982). *See also Devine v. White,* 697 F.2d 421, 429 (D.C.Cir. 1983); *Bryant v. Civiletti,* 663 F.2d 286, 292 (D.C.Cir.1981). Through its use of the phrase, "notwithstanding any other provision of law," Congress expressly made inapplicable all provisions of law that would prevent or impede the voluntary movement of a VHF commercial station to an unserved state. This conclusion is buttressed by the conference committee report, which says that section 331 was designed to "remove impediments which currently discourage a licensee in a State which has more than one VHF television station from voluntarily moving to a State which has none." H.R.Rep. No. 760, 97th Cong., 2d Sess. 690 (1982); S.Rep. No. 530, 97th Cong., 2d Sess. 690 (1982), U.S.Code Cong. & Admin.News 1982, p. ——. Section 331 thus displaced the normal procedures for channel reallocation as well as the normal procedures for issuing licenses, including the requirement of a comparative hearing.[10]

## C. *The Alleged Constitutional Violation*

Finally, Multi-State argues that its constitutional right to due process was violated when the Commission applied section 331 to deprive Multi-State of its vested right to a comparative hearing. Multi-State contends that it acquired a vested right to a hearing pursuant to the Supreme Court's decision in *Ashbacker Radio Corp. v. FCC,* 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). In *Ashbacker,* the Supreme Court, in construing section 309(a) of the Communications Act,[11] held that "where two *bona fide* [license] applications are mutually exclusive the grant of one without a hearing to both deprives the loser of the opportunity which Congress chose to give him." 326 U.S. at 333, 66 S.Ct. at 151. Multi-State contends that the Commission committed constitutional error in interpreting section 331 so as to divest Multi-State of its right to a hearing pursuant to *Ashbacker.*

Contrary to Multi-State's assertion, the decision in *Ashbacker* does not confer upon Multi-State a constitutional right to a hearing. The right to a hearing in *Ashbacker* stemmed from a statutory scheme in the Communications Act that ordinarily precludes denial of a license application without a hearing. The enactment of section 331, however, altered the statutory scheme discussed in *Ashbacker.* In section 331, Congress made one limited exception to the comparative hearing requirement to achieve the overriding objective of bringing an operational VHF commercial television station to unserved states such as New Jersey and Delaware. Thus, in the limited context of section 331, Congress made moot the hearing procedures construed in *Ashbacker.*

Congress, of course, has paramount power in the regulatory field. *See F.H.A. v. Darlington, Inc.,* 358 U.S. 84, 91 n. 6, 79 S.Ct. 141, 146 n. 6, 3 L.Ed.2d 132 (1958).

---

**10.** We also reject Multi-State's contention that the Commission's "cut-off" rules entitle Multi-State to a comparative hearing. The Commission's "cut-off" rules protect timely-filed license applicants from competition with late-filed applicants. *See* Bronco Broadcasting Co., 58 F.C.C.2d 909, 910–11 (1976). In this case, the Commission acted pursuant to section 331 to eliminate the availability of Channel 9 in New York to *any* applicant. The applications of RKO and Multi-State for the deleted New York channel became moot, and the Commission properly dismissed them both on this ground. 53 Rad.Reg.2d (P & F) 671 (1983), J.A. at 19. Thus, the "cut-off" rules became inapplicable.

**11.** Section 309(a) of the Communications Act provides:

Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

47 U.S.C. § 309(a) (1976).

We find section 331 to be permissible regulation of future action: it directs the Commission, under specified and limited circumstances, to reallocate a VHF channel and issue a license for that channel.[12] As the Supreme Court said in *Darlington:*

Federal regulation of future action based upon rights previously acquired by the person regulated is not prohibited by the Constitution. So long as the Constitution authorizes the subsequently enacted legislation, the fact that its provisions limit or interfere with previously acquired rights does not condemn it.

358 U.S. at 91, 79 S.Ct. at 146 (quoting *Fleming v. Rhodes,* 331 U.S. 100, 107, 67 S.Ct. 1140, 1144, 91 L.Ed. 1368 (1947)).

We recognize that the Commission's action pursuant to section 331 terminates abruptly, albeit temporarily,[13] Multi-State's pursuit of a license for Channel 9. Nevertheless, Congress elevated the goal of providing unserved states with an operational VHF commercial television station. The Commission merely effected congressional intent. The fact that the Commission's action frustrated Multi-State's expectations is no basis for finding that the Commission committed constitutional error. *See Motor and Equipment Mfrs. Ass'n v. EPA,* 627 F.2d 1095, 1128 (D.C.Cir.1979), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980).

### III. Conclusion

In construing section 331, our duty is to find that interpretation which most fairly

can be said to effect the legislative will. *See Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). Our interpretation of section 331 coincides with that of the Commission. Although we sympathize with the situation in which Multi-State finds itself as a result of the Commission's orders, we find that the actions taken by the Commission were mandated by Congress. Accordingly, the Commission's orders are

*Affirmed.*

---

**12.** Congress acted within its lawful powers under the commerce clause in enacting section 331. The due process clause does not bar the exercise of those powers. *See, e.g., Flemming v. Nestor,* 363 U.S. 603, 611–12, 80 S.Ct. 1367, 1372–73, 4 L.Ed.2d 1435 (1960); *Motor and Equipment Mfrs. Ass'n, Inc. v. EPA,* 627 F.2d 1095, 1127 (D.C.Cir.1979), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980). *See also Daylo v. Administrator of Veterans' Affairs,* 501 F.2d 811, 816 (D.C.Cir.1974) (quoting *McCullough v. Virginia,* 172 U.S. 102, 123–24, 19 S.Ct. 134, 141–42, 43 L.Ed. 382 (1898)) ("[l]egislation may act on subsequent proceedings, [and] may abate actions pending").

We note that licensees of broadcasting stations acquire no prescriptive right against the subsequent exercise of congressional power un-

der the commerce clause to delete their station to achieve fair geographical distribution of broadcast service. *Federal Radio Comm'n v. Nelson Brothers Bond and Mtge. Co.,* 289 U.S. 266, 282, 53 S.Ct. 627, 635, 77 L.Ed. 1166 (1933). *A fortiori,* the mere expectations of a license applicant cannot bar the legitimate exercise of such congressional power. As the Supreme Court has advised: "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Darlington,* 358 U.S. at 91, 79 S.Ct. at 146.

**13.** Multi-State may, of course, apply for a license for Channel 9 in New Jersey at the expiration of RKO's license.