815 F.2d 1551
 259 U.S.App.D.C. 350
 MAXCELL TELECOM PLUS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
Yankee Celltell Co., Southwestern Bell Mobile Systems, Inc.,
BellSouth Mobility Inc., Bell Atlantic Mobile Systems, NYNEX
Mobile Communications Co., Radiofone, Inc., Centel
Corporation, MCI Cellular Telephone Company, et al., New
Vector Communications, Inc., Telephone and Data Systems,
Inc., Ameritech Mobile Communications, Inc., Baldwin
Telecom, Inc., Contel Cellular Inc., Intervenors.
NORTHWESTERN INDIANA TELEPHONE COMPANY, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
Yankee Celltell Co., BellSouth Mobility Inc., Southwestern
Bell Mobile Systems, Inc., Bell Atlantic Mobile Systems,
NYNEX Mobile Communications Co., Radiofone, Inc., Centel
Corporation, MCI Cellular Telephone Company, et al.,
Telephone and Data Systems, Inc., Ameritech Mobile
Communications, Inc., Continental Telecom, Inc., Baldwin
Telecom, Inc., Intervenors.
MAXCELL TELECOM PLUS, INC., et al., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
St. Louis Cellular System, Inc., New Orleans CGSA, Inc.,
Centel Corporation, Yankee Celltell, Co.,
NewVector Communications, Inc.,
Continental Telecom, Inc.,
Intervenors.
LA STAR CELLULAR TELEPHONE COMPANY, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
New Orleans CGSA, Inc., Contel Cellular, Inc., Intervenors.
NORTHWESTERN INDIANA TELEPHONE COMPANY, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
New Orleans CGSA, Inc., Ameritech Mobile Communications,
Inc., Contel Cellular Inc., Intervenors.
Harry J. PAPPAS d/b/a California Portaphone, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
NYNEX Mobile Communications Co., BellSouth Mobility Inc.,
MCI Cellular Telephone Company, et al., Telephone and Data
Systems, Inc., Ameritech Mobile Communications, Inc.,
Continental Telecom, Inc., Bell Atlantic Mobile Systems,
Southwestern Bell Mobile Systems, Inc., Intervenors.
 Nos. 85-1322, 85-1331, 85-1332, 85-1335 and 85-1346.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 22, 1986.
Decided April 7, 1987.
As Amended April 7, 1987.
 
 Petitions for Review and Notices of Appeals of Orders of the Federal Communications Commission.
 George Petrutsas, with whom Richard Hildreth and Frank R. Jazzo, Washington, D.C., were on brief, for petitioner, Harry J. Pappas d/b/a California Portaphone, in No. 85-1346.
 Arthur V. Belendiuk, Washington, D.C., for petitioner/appellant, La Star Cellular Telephone, et al., in Nos. 85-1322, 85-1331 and 85-1332.
 David L. Nace, with whom Russell D. Lukas and Pamela L. Gist, Washington, D.C., was on brief, for petitioner/appellant, Northwestern Indiana Telephone Company, Inc., in Nos. 85-1324 and 85-1335.
 Roberta L. Cook, Counsel, Federal Communications Commission, with whom Jack D. Smith, General Counsel, Daniel M. Armstrong, Associate General Counsel and John E. Ingle, Deputy Associate General Counsel, Federal Communications Comm., Washington, D.C., were on brief, for respondents/appellees. Robert B. Nicholson and Margaret G. Halpern, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondents/appellees in Nos. 85-1322, 85-1324, 85-1331, 85-1332, 85-1335 and 85-1346.
 Alan B. Sternstein, with whom Raymond F. Scully, Katherine I. Hall, Washington, D.C., and Martin C. Ruegsegger were on joint brief, for intervenors, Bell Atlantic Mobile Systems, Inc., et al., in Nos. 85-1322, 85-1324, 85-1331, 85-1332, 85-1335 and 85-1346.
 John W. Berresford, Philadelphia, Pa., entered an appearance for Bell Atlantic Mobile Systems, Inc.
 Edward R. Wholl, Washington, D.C., entered an appearance for NYNEX Mobile Communications Co.
 Richard B. Severy, Washington, D.C., was on brief, for intervenor, MCI Cellular Telephone Company, et al., in Nos. 85-1322, 85-1324 and 85-1346.
 Charles A. Zielinski and A. Richard Metzger, Jr., Washington, D.C., were on brief, for intervenor, Ameritech Mobile Communications, Inc., in Nos. 85-1322, 85-1324, 85-1335, 85-1346. Joseph J. Simons also entered an appearance for Ameritech Mobile Communications, Inc.
 Arthur Blooston, Harold Mordkofsky, Robert M. Jackson and Edward P. Taptich, Washington, D.C., entered appearances for intervenors, Yankee Celltell Co., et al., in Nos. 85-1322, 85-1324 and 85-1331.
 Theodore D. Frank and Marilyn D. Sonn, Washington, D.C., entered an appearance for intervenor, Centel Corp., in Nos. 85-1322, 85-1324 and 85-1331.
 Leon T. Knauer and L. Andrew Tollin, Washington, D.C., entered appearances for intervenor, NewVector Communications, Inc., in Nos. 85-1322 and 85-1331.
 Alan Y. Naftalin and Peter Connolly, Washington, D.C., entered appearances for intervenor, Telephone and Data Systems, Inc., in Nos. 85-1322, 85-1324 and 85-1346.
 Dean George Hill, Washington, D.C., entered an appearance for intervenor, Baldwin Telecom, Inc., in Nos. 85-1322 and 85-1324.
 John A. Borsari, Washington, D.C., and Joseph P. Benkert, entered appearances for intervenor, Centel Cellular Inc., in Nos. 85-1322, 85-1324, 85-1331, 85-1332, 85-1335 and 85-1346.
 Before BORK and BUCKLEY, Circuit Judges, and HAROLD H. GREENE,* District Judge.
 Opinion for the Court filed by Circuit Judge BORK.
 BORK, Circuit Judge:
 
 
 1
 These consolidated cases present challenges to two features of the procedures established by the Federal Communications Commission to award cellular radiotelephone licenses. Petitioner California Portaphone ("Portaphone") claims that the use of a lottery procedure to select licensees for the Fresno, California market was an invalid retroactive application of the procedure, since comparative applications for the Fresno market had been filed before the Commission adopted a lottery procedure. The remaining challengers (hereinafter collectively the "fill-in appellants") object to the Commission's treatment of their applications to provide "fill-in" service in various markets. The Commission returned the applications, finding that they were filed out of time.
 
 
 2
 We affirm the Commission's retroactive application of the lottery procedure to the Fresno market; we reverse the Commission's order rejecting application of appellant La Star Cellular Telephone Company ("La Star") in the New Orleans market as untimely and affirm the Commission's orders rejecting as untimely the remaining appellants' applications.
 
 I.
 
 3
 Confronted with a heavy demand for cellular telephone service and a large group of firms eager to provide it, the Federal Communications Commission has sought to streamline the procedures for awarding cellular licenses. The Commission has eliminated the standard comparative hearing used to select licensees and replaced it with a simplified comparative "paper hearing" for the thirty largest cellular markets and with a lottery procedure for smaller markets. The Commission also has introduced special filing procedures and cut-off dates based on the market at issue in each proceeding. Cellular Communications Systems, 86 F.C.C.2d 469, 498-503 (1981) (Cellular Order ); Cellular Communications Systems, 89 F.C.C.2d 58, 85-94 (1982) (Reconsideration Order ); Cellular Communications Systems, 90 F.C.C.2d 571, 572-75 (1982) (Further Reconsideration Order ); Cellular Lottery Rulemaking, Report and Order, 98 F.C.C.2d 175, 202-09 (1983) (Cellular Lottery Order ). Further details of the Commission's decisions on these procedures are discussed separately as they relate to each of the issues before us.
 
 II.
 
 4
 We begin with Portaphone's challenge to the validity of the Commission's decision to extend its lottery procedures to Portaphone's previously pending comparative application. Review of retroactive agency action "is in each case a question of law, resolvable by reviewing courts with no overriding obligation to the agency['s] decision." Retail, Wholesale & Dep't Store Union v. NLRB, 466 F.2d 380, 390 (D.C.Cir.1972).
 
 A.
 
 5
 The Commission receives authority to use a lottery to award licenses for certain communications systems from section 309(i) of the Communications Act. 47 U.S.C. Sec. 309(i) (1982).[1] Although this statute was in place prior to the March, 1983 cut-off date for Portaphone's Fresno application, the Commission specifically proposed to employ a lottery in markets including Fresno after the date of Portaphone's filing. Cellular Lottery Proceeding, Notice of Proposed Rulemaking, 48 Fed.Reg. 51,493 (proposed Oct. 23, 1983). Portaphone argues that the Commission's adoption of this lottery proposal for the Fresno market, a lottery Portaphone ultimately lost, is an invalid retroactive application of the rule. The Commission carefully and fully considered this objection in its Cellular Lottery Order, 98 F.C.C.2d at 182-84, 188-89. The Commission's analysis is correct.
 
 B.
 
 6
 As the Supreme Court has explained, retroactive enforcement of a rule is improper only if "the ill effect of the retroactive application" of the rule outweighs the "mischief" of frustrating the interests the rule promotes. SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947); see Retail, Wholesale & Dep't Store Union, 466 F.2d at 389-90. Since we believe that the "ill effect" on Portaphone of the lottery's retroactive effect is little or none, and that the "mischief" caused by prohibiting retroactive effect would be significant, we reject Portaphone's contention and uphold the Commission's application of the lottery proposal to the Fresno market.
 
 
 7
 We turn first to the series of harms alleged by Portaphone. Portaphone complains that the belated decision to implement a lottery in lieu of a comparative hearing caused it unnecessarily to incur the costs of filing a comparative application. In fact, as the Commission noted, its decision has relieved Portaphone of the much greater expense in attorneys' fees, expert witness fees and the like that a comparative hearing would require. Cellular Lottery Order, 98 F.C.C.2d at 183, 188-89.
 
 
 8
 Moreover, before Portaphone filed its application, it was on notice that the Commission might implement a lottery for cellular licenses. See Cellular Order, 86 F.C.C.2d at 499 (use of lottery may be required if "[f]uture events" so dictate). Thus Portaphone could not reasonably rely on the continued use of comparative hearings. Portaphone also complains that had it known that a lottery would be instituted and application costs thus lowered, it would have applied for cellular franchises in other markets. Such an alleged lost opportunity is wholly speculative and does not rise to the level of detrimental reliance on the absence of a lottery procedure since, as the Commission noted, the number of markets an applicant seeks is a business decision governed primarily not by the litigation costs of comparative proceedings but by the ability of the applicant to fund and construct a system in each market. 98 F.C.C.2d at 183 n. 26.
 
 
 9
 Portaphone furthermore argues that it has been deprived of its right to a comparative hearing under Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). The Ashbacker decision found no such "right," but merely held that the Commission must use the same set of procedures to process the applications of all similarly situated persons who come before it seeking the same license. See Multi-State Communications, Inc. v. FCC, 728 F.2d 1519, 1525-26 (D.C.Cir.1984). Since all persons seeking the Fresno market's license became equally subject to the lottery procedure, the Commission fully satisfied the Ashbacker rule.
 
 
 10
 In short, since Portaphone has suffered neither the deprivation of a right nor the imposition of new and unexpected liabilities or obligations, Portaphone has not suffered any significant injury from the retroactive effect of the lottery procedure. See NLRB v. Bell Aerospace Co., 416 U.S. 267, 295, 94 S.Ct. 1757, 1772, 40 L.Ed.2d 134 (1974).
 
 
 11
 On the other side of the Chenery balance is the question of whether retroactive application of the lottery procedure furthers the purposes underlying implementation of a lottery. We think it unquestionable that the Commission's overriding concern with efficient processing of the many applications for cellular licenses, which it explained in the Cellular Lottery Order, 98 F.C.C.2d at 181-82, fully justifies the Commission's decision. See Pappas v. FCC, 807 F.2d 1019, 1022 (D.C.Cir.1986) (large number of multipoint distribution service applications already on file supported Commission's decision to institute lottery). Indeed, Congress intended the Commission to have the power to impose a lottery retroactively to further the lottery statute's purpose of preventing excessive delays and costs in license decisions. See 47 U.S.C. Sec. 309(i)(1) (1982) ("[i]f there is more than one application," Commission may award license by lottery (emphasis added)). This point is clearly made in the legislative history, which shows that among the factors the Commission may rely on in establishing a lottery are a large number of mutually exclusive applications for each license and the "existence of a backlog" of applications--factors that could be assessed only after applications had been received. H.R. Conf.Rep. No. 765, 97th Cong., 2d Sess. 37-38 (1982), U.S.Code Cong. & Admin.News 1982, pp. 2237, 2281-2282. In particular, the Commission's use of the lottery as an incentive to promote settlements among competing applicants further illustrates the beneficial effects of a lottery; indeed, after the Commission decided to use a lottery, applicants in all but two markets subsequently settled among themselves.
 
 
 12
 We conclude that the Commission's decision to apply the lottery in the Fresno market to applications that were already filed was within its statutory authority and was fully justified.
 
 III.
 
 13
 The challenge brought by the fill-in appellants involves the reach of the procedures employed by the Commission to fix dates by geographic market on which cellular license applications would be due. Appellants assert that the deadlines established by these procedures may not validly apply to fill-in applications.
 
 
 14
 We hold that the deadlines may validly apply to a fill-in application unless that application was filed in response to a major amendment expanding the service area of an incumbent licensee.
 
 A.
 
 15
 In the Cellular Order, the Commission determined to divide the cellular spectrum in each geographic market between two cellular licensees, one a "wireline" applicant, i.e., a telephone company providing local exchange service (such as one of the Bell operating companies) and the other a non-wireline applicant. Cellular Order, 86 F.C.C.2d at 482-83. A cellular licensee need not serve the entirety of a geographic market area. Rather, the Cellular Order mandated that each cellular applicant seek a license to serve a self-defined "market" called its cellular geographic service area ("CGSA"): The CGSA "is the area defined by the applicant as the area it intends to serve." Id. at 509.[2] For example, the CGSA for the successful wireline applicant in the New Orleans market included only 8.8% of that market as defined by the Census Bureau. See supra note 2. Each competing applicant's selection of its CGSA is crucial to the success of its application, since applications for CGSAs that materially overlap trigger a comparative evaluation of the applications by the Commission. 86 F.C.C.2d at 510.[3]
 
 
 16
 A cellular fill-in application is an application for cellular service, filed after the initial award of cellular licenses, to "fill in," i.e., serve a part of the SMSA outside the CGSAs of the initial cellular licensees. For example, if the Commission had awarded licenses in the New York SMSA to two applicants whose CGSAs comprised only the City of New York, a fill-in applicant might thereafter seek to serve a CGSA comprising only Westchester County (also a part of the New York SMSA). Appellant La Star filed its fill-in application in response to an attempt by the incumbent wireline licensee in the New Orleans market to expand its CGSA into unserved parts of that market.[4] The other fill-in appellants filed unopposed fill-in applications for areas of the Boston, Gary, Minneapolis-St. Paul and St. Louis markets that the incumbent licensees neither served nor sought to serve.[5] Based on the deadlines whose establishment is discussed below, the Commission rejected each appellant's application, filed after the pertinent cut-off date,[6] as untimely.
 
 
 17
 The fill-in appellants argue that the Commission's imposition of these procedures on fill-in applications was effected without adequate notice to appellants, without proper promulgation under the Administrative Procedure Act, and in violation of the rule established by Ashbacker Radio Corp. v. FCC. Although we hold that the Commission's notice to appellant La Star of the deadline for the New Orleans market was insufficient, we otherwise find appellants' arguments unpersuasive.
 
 B.
 
 18
 To assess the challenges to the Commission's rule on fill-in applications, we cannot avoid a detailed discussion of the cellular licensing process as presented in the Commission's statements setting out its procedures for cellular applicants.
 
 
 19
 If the CGSAs defined by two applicants overlap, then under the Cellular Order the applications are deemed mutually exclusive and the license is awarded by a comparative proceeding between the competing applicants. Cellular Order, 86 F.C.C.2d at 510; see 47 C.F.R. Secs. 22.31(a)(1), 22.916(a) (1986). In contrast, if an applicant seeks a license for a CGSA that does not overlap with another applicant's, the applicant will receive the license so long as it meets the Commission's basic qualification requirements. See 86 F.C.C.2d at 501-02. But under the Commission's general rules on public notice and cut-off dates, left unchanged by the Cellular Order, id. at 510, a later applicant would be able to force a comparative proceeding with a previously filed application by filing a competing application for an overlapping CGSA. That is, if a person becomes aware of a pending license application and wishes to obtain the license for that area himself, he may file an application of his own for the license and obtain a comparative hearing on the license before the Commission with the prior applicant. See 47 C.F.R. Sec. 22.31(b) (1986) (comparative consideration of mutually exclusive applications required if later application filed by earlier of (1) 60 days after date of general public notice listing first application as acceptable for filing or (2) one business day before Commission's final action on first application).
 
 
 20
 The Cellular Order further amended the Commission's rules to deem any amendment proposing expansion of a cellular licensee's CGSA a "major" amendment under the rules. 86 F.C.C.2d at 509, 510, 561 (amending 47 C.F.R. Sec. 22.23(c) (1986)). The Commission's general rules define a "major" amendment to a license in force as an amendment subject to the general public notice, cut-off, and comparative evaluation provisions discussed above. 47 C.F.R. Sec. 22.23(c) (1986). As a result, under the Commission's rules as established by the Cellular Order, a licensee's later attempt to expand its CGSA would also be open to challenge by anyone who filed a competing application before the applicable cut-off date.
 
 
 21
 In the Cellular Reconsideration Order, the Commission found it necessary to alter the procedural scheme established by the Cellular Order. Two alterations are notable for our purposes. First, the Commission limited the maximum CGSA an applicant may propose to approximately the size of the Standard Metropolitan Statistical Area that its CGSA includes. Reconsideration Order, 89 F.C.C.2d at 86-87. Second, the Commission implemented special filing rules for cellular applications in the 30 largest SMSAs to replace the general public notice and cut-off periods retained by the Cellular Order. Reconsideration Order, id. at 87-94. Specifically, the Commission established a single filing date for "[a]ll applications, both wireline and non-wireline, for the 30 largest" SMSAs. Id. at 89. The Commission stated further that "[a]pplications will be accepted for these markets after the date certain only if one, or both, [of the] frequency blocks is not applied for on that date." Id. The Commission subsequently extended this date-certain cut-off procedure to the 90 largest SMSAs. Further Reconsideration Order, 90 F.C.C.2d at 572-75. In short, this second change set the deadline for filing an application using fixed dates by market area rather than through reference to each application's mutual exclusivity with a previously filed application.
 
 C.
 
 22
 With this history of the Commission's procedures in mind, we consider whether any of these fill-in applications is barred as untimely by the Commission's date-certain cut-off rules for cellular applications. Appellants offer three reasons why the cut-off rules do not support rejection of their fill-in applications as untimely. First, they claim that they received inadequate notice that the cut-off rules meant to reach fill-in applications. Second, they claim that the cut-off rules were invalidly promulgated under the Administrative Procedure Act's notice and comment requirements, set out in 5 U.S.C. Sec. 553 (1982). Third, they claim that the Commission's rejection of their applications violates the rule of Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). We consider each of these objections in turn.
 
 
 23
 1. The legal standard regarding the Commission's duty to provide license applicants adequate notice of its requirements has been previously explained by this court:
 
 
 24
 It is beyond dispute that an applicant should not be placed in the position of going forward with an application without knowledge of requirements established by the Commission, and elementary fairness requires clarity of standards sufficient to apprise an applicant of what is expected. As Judge Leventhal stated in Radio Athens, Inc., (WATH) v. F.C.C., 401 F.2d 398, 404 (1968) (dismissal of application without hearing for patent non-conformance with Commission rules):
 
 
 25
 "The Commission is entitled to expect good faith on the part of the broadcasting industry in supplying data requested. The industry is correspondingly entitled to expect rules defining the required content of applications that are reasonably comprehensible to men acting in good faith." (emphasis added) (footnote omitted).
 
 
 26
 If an applicant ignores or fails to understand "reasonably comprehensible" requirements, he cannot be heard to complain about lack of notice.
 
 
 27
 Bamford v. FCC, 535 F.2d 78, 82 (D.C.Cir.1976) (citation and footnote omitted) (Commission's rejection of broadcast license application lacking required information upheld). Accord Salzer v. FCC, 778 F.2d 869, 875 (D.C.Cir.1985) (Commission's requirement that applications be "letter-perfect" defeated by Commission's "incomplete" or "ambiguous" instructions to applicants).
 
 
 28
 The Commission's public pronouncements on the deadline for fill-in applications have been needlessly unclear. The Commission is able to state its position clearly, as it did in footnote 81 of the Cellular Lottery Order.[7] Unfortunately, the Commission offered this discussion only after the cut-off dates for the appellants before us had long passed. The Commission's earlier statements on the fill-in issue were less clear. Throughout its consideration of the award of cellular licenses, the Commission has focused on the applicant who sought to serve the core of the SMSAs, the large central urban areas most in need of cellular service. See, e.g., Cellular Order, 86 F.C.C.2d at 510 (comparative evaluation will be given to competing applicants "in the same central city"). Nonetheless, the consistent language used by the Commission referred broadly to applications for "markets" or "SMSAs." Specifically, the Commission used this language to describe the application cut-off procedure established by the Reconsideration Order:
 
 
 29
 [I]n our [Cellular] Order we said that cellular applicants should follow the public notice and cut-off periods generally applicable to mobile services under Part 22 of our Rules. 86 FCC2d at 510. However, after further reflection, we have decided to make special provision for cellular applications in the top 30 SMSAs in order to avoid unnecessary processing delays that might result from inundating the agency with a large number of applications filed at the same time.... Accordingly, we will accept applications for the 30 largest SMSAs ... on the 90th day after publication of this Order in the Federal Register.
 
 
 30
 ....
 
 
 31
 All applications, both wireline and non-wireline, for the 30 largest modified SMSAs will fall due on a date certain as specified above. Applications will be accepted for these markets after the date certain only if one, or both, [of the] frequency blocks is not applied for on that date.
 
 
 32
 89 F.C.C.2d at 87-89 (emphasis added). It is this language, the Commission now argues to us, that provided the fill-in appellants with notice that their ability to fill in would end at the cut-off date.
 
 
 33
 The Commission's lack of clarity in the Reconsideration Order is unfortunate. Nonetheless, we find that the language quoted above sufficed, though just barely, to give notice to NITCO and other appellants similarly situated that the Commission would not accept a fill-in application filed in the first instance after the cut-off date.[8] The Commission's broad phrasing cannot reasonably be read to suggest that only applications for a "large area within" the SMSA or for a "large part" of the SMSA would be subject to the cutoff. The Commission also in no way indicated that the deadline would cut off only applications in the relevant SMSA for CGSAs believed by the applicant to be electrically mutually exclusive, as NITCO seems to suggest. It stated rather that "all" applications in the SMSA would be cut off, or referred without qualification to the cut-off of "applications." Quite simply, the Commission's language indicated to any reasonable reader that applications to serve any territory "in" or "for" a pertinent SMSA, 89 F.C.C.2d at 87, 89, would be cut off by the deadline. Further, the Commission has not as a general matter distinguished between fill-in and non-fill-in applicants for procedural purposes. That the Commission easily could have been completely clear by stating its position in so many words shows a regrettable and needless deficiency in drafting, but this deficient statement was nonetheless enough, we believe, to give notice.
 
 
 34
 La Star's challenge to the Commission's rejection of its application requires a different result. La Star filed its fill-in application in response to a major amendment by an incumbent licensee that sought to expand its CGSA. See supra note 4. As noted above, the Commission's general procedures routinely permit a major amendment by a licensee to be opposed by a timely subsequent competing submission in a comparative proceeding. See 47 C.F.R. Secs. 22.23, 22.27, 22.31, 22.35 (1986). The Cellular Order had indicated that these procedures would specifically apply to an amendment to expand a licensee's CGSA. 86 F.C.C.2d at 510 (general public notice and cut-off procedures will apply to changes in CGSA). La Star's application therefore was timely if governed by the Commission's general procedures as indicated in the Cellular Order, because La Star filed within the 60 days allowed after public notice of a major amendment. Compare supra note 4 with 47 C.F.R. Sec. 22.31(b)(2) (1986).
 
 
 35
 Nothing in the language we have quoted above and nothing elsewhere in the Reconsideration Order informed La Star that the Reconsideration Order superseded the Cellular Order in this respect; thus La Star had no notice that it might lose its ability to choose between filing an initial application before the cut-off for the fringe area it sought or contesting with a competing application an incumbent licensee's major amendment filed after the cut-off to serve that fringe area. The Commission has clearly indicated in its cellular pronouncements that an incumbent licensee is not barred by any cut-off from seeking expansion of its CGSA through major amendment. See Cellular Lottery Order, 98 F.C.C.2d at 204 n. 81; Cellular Order, 86 F.C.C.2d at 509 (countenancing applications "to change the boundaries of a CGSA"). But only in footnote 81 of the Cellular Lottery Order, supra note 7, did the Commission first indicate that such an amendment could not be challenged by a competing application.[9] Since the Commission failed to provide sufficient notice to La Star of the scope of the cut-off procedure established by the Reconsideration Order, the Commission may not reject La Star's competing fill-in application. See Ridge Radio Corp. v. FCC, 292 F.2d 770, 773 (D.C.Cir.1961) (public notice of cut-off date must "fairly advise prospective applicants of what is being cut off by the notice"). Accordingly, we order the Commission to reinstate La Star's application nunc pro tunc.
 
 
 36
 2. NITCO next claims that the fill-in cut-off procedure was invalidly promulgated under the Administrative Procedure Act because the Commission failed to comply with the notice and comment requirements of substantive rulemaking set out in 5 U.S.C. Sec. 553 (1982). This argument lacks merit. The cut-off rule arguably may be understood as an "interpretative" rule, a rule of agency "procedure" or of agency "practice," any of which is exempt from the notice and comment requirements, id. Sec. 553(b)(A). But we need not decide this issue, since we believe that the cut-off rule did receive the required notice and comment as part of the Cellular Reconsideration Order. Initially, the Commission released a Notice of Proposed Rulemaking "looking toward the amendment of Parts 2 and 22 of the Commission's Rules ... concerning policies, standards and procedures for licensing and implementation of cellular communications systems." 78 F.C.C.2d 984, 984 (1980). In particular, the Notice offered for comment a proposed "hybrid procedure" to replace the traditional comparative hearing. Id. at 1000-01. Although this scheme proposed no date-certain cut-off deadline, the Notice also specifically sought comment on "establishment of a firm deadline for the submission of issue pleadings related to the mutually exclusive applications," id. at 1001, sought comment on a wide range of other procedures, id. at 1000-02, and stated further that "[i]t is not our intent that rules presently applicable" to services regulated by the Commission "automatically apply to cellular service," id. at 1002 n. 36. This Notice, we believe, provided the opportunity for notice and comment required by the APA. Publication of the Cellular Order and Reconsideration Order thus established validly promulgated Commission rules concerning the cut-off procedure.
 
 
 37
 3. Finally, NITCO argues that Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), requires us to conclude that the cut-off procedure violated its alleged right to a comparative hearing.[10] This contention need not long detain us. Ashbacker held that the Commission could not award a license without granting a timely competing application the comparative hearing required by its own rules. Ashbacker therefore simply is irrelevant to a situation where a license applicant complains that its application was not considered due to a "regulation" that "for orderly administration, requires an application ... to be filed within a certain date," id. at 333 n. 9, 66 S.Ct. at 151 n. 9 (noting that the case before the Court did not involve this situation). Indeed, this court has recognized that the Ashbacker decision "suggested" that the Commission may properly employ "cut-off procedure[s]." Committee for Open Media v. FCC, 543 F.2d 861, 873 & n. 79 (D.C.Cir.1976). Only by compliance with such procedures may an application enter the ranks of "bona fide applications" protected by Ashbacker, 326 U.S. at 333, 66 S.Ct. at 151. See Reuters, Ltd. v. FCC, 781 F.2d 946, 951 (D.C.Cir.1986) (Ashbacker "applies not to prospective applicants, but only to parties whose applications have been declared mutually exclusive ") (emphasis in original).
 
 IV.
 
 38
 The heavy demand for a new product, cellular telephone licenses, has forced the Commission to narrow drastically the procedures it routinely employs to process license requests for established services. Apart from a lack of fair notice to those applicants that seek to contest territorial expansion by incumbent licensees, we find the Commission's cut-off rules and retroactive application of its lottery process entirely reasonable and lawful. Accordingly, we order the Commission to reinstate La Star's fill-in application nunc pro tunc, but affirm the Commission's rejection of the applications from the other fill-in appellants and the Commission's use of the lottery procedure to reject Portaphone's license application.
 
 
 39
 It is so ordered.
 
 
 
 *
 Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C.A. Sec. 292(a)
 
 
 [1]
 The statute provides:
 If there is more than one application for any initial license ..., then the Commission ... shall have authority to grant such license ... through the use of a system of random selection.
 47 U.S.C. Sec. 309(i)(1) (1982).
 The Commission's general authority to institute lottery proceedings is not disputed in this appeal.
 
 
 [2]
 In this opinion, these self-defined "markets" will be referred to as "CGSAs," while "market" will be used synonymously with the Standard Metropolitan Statistical Areas ("SMSAs") established by the U.S. Census Bureau
 
 
 [3]
 In markets other than the 30 largest, where the Commission replaced the paper comparative proceeding with a lottery, definition of the CGSA remains critical in that non-overlapping CGSAs do not trigger a lottery in the first instance
 
 
 [4]
 On August 17, 1983, approximately one month after the Commission granted the unopposed application of wireline carrier New Orleans CGSA, Inc. ("NOCGSA") to serve some 8.8% of the New Orleans SMSA, the Commission issued a public notice of NOCGSA's application to enlarge its authorized CGSA within the New Orleans market. In response to the public notice listing NOCGA's enlargement application, La Star on September 16, 1983 filed a mutually exclusive application to serve the area comprised by NOCGSA's proposed enlargement along with additional New Orleans SMSA territory. La Star's application was not mutually exclusive with any part of NOCGSA's original CGSA. The Commission's Common Carrier Bureau found that the cut-off scheme of the Cellular Reconsideration Order rendered La Star's petition untimely; it thus rejected La Star's application as improperly filed and granted NOCGSA's now-unopposed enlargement application. New Orleans CGSA, Inc., No. 6904 (Common Carrier Bureau Oct. 1, 1984), aff'd, FCC 85-209 (May 6, 1985); New Orleans CGSA, Inc., No. 6458 (Common Carrier Bureau Aug. 16, 1985)
 
 
 [5]
 These appellants are Lake Bridge Cellular Telephone Company (Minneapolis-St. Paul market), Hamel-St. Jacob Cellular Telephone Company (St. Louis market), Maxcell Telecom Plus, Inc. (Boston market), and Northwestern Indiana Telephone Company, Inc. ("NITCO") (Gary, Indiana market). The Commission rejected these appellants' applications collectively in Lake Bridge Cellular Tel. Co., FCC 85-208 (May 6, 1985). Since the other three appellants mentioned in this paragraph filed a Rule 28(i) Statement joining NITCO's brief to this court, these appellants will be referred to in the text collectively as "NITCO."
 
 
 [6]
 The fill-in applications of Hamel-St. Jacob, Lake Bridge, La Star and Maxcell Telecom involved territory in the 30 largest markets and were filed after the cut-off date of June 7, 1982 established for each of those markets. NITCO's fill-in application involving the Gary, Indiana market was filed after the November 7, 1982 cut-off date for the Gary market
 
 
 [7]
 In the Cellular Lottery Order, the FCC stated:
 
 
 [54]
 We have decided to accept applications for the below-90 markets in phases similar to those used for the above-90 markets.... Finally, since the setting of a phased acceptance schedule for the remaining markets is intended to establish and maintain an orderly processing system and is primarily an administrative concern, there is no prejudice or disadvantage to prospective applicants in our deciding not to accept applications for all remaining markets at one time[81]
 
 
 [81]
 Applications for a market or any part of a market are due on a specified date and subsequent applications for that market or any part of it will be rejected as untimely. See generally Green Country Mobilephone, Inc., FCC 84-180, released May 15, 1984. Under sections 22.903(d) and 22.913(a) of the Rules, however, we will allow a cellular permittee or licensee to apply to modify its existing authorization in order to increase its CGSA within the boundaries of the relevant MSA[ = SMSA] or NECMA. Although this constitutes a "major application" and must be placed on Public Notice for Petitions to Deny, we will not permit the filing of mutually exclusive applications during the initial nationwide cellular licensing period. We have long held that the public interest is served by allowing a cellular system operator the flexibility necessary to modify its system in response to marketplace forces. See Cellular Communications Systems, 86 FCC2d at 509. Such modifications are natural extensions of an existing permittee's or licensee's cellular authorization in response to growing or changing demand and should be subject to minimal regulatory oversight during the initial nationwide cellular licensing period. However, after the initial application phase, we will reopen any unapplied for areas to any applicant under regular notice and cutoff rules....
 
 
 [98]
 F.C.C.2d at 203-04 & n. 81 (emphasis added). See also Memorandum Opinion and Order on Reconsideration, 101 F.C.C.2d 577, 592 (1985) ("applications for any portion of" SMSA cut off by filing deadlines)
 
 
 [8]
 The cut-off procedure was rendered applicable to NITCO's market area in the Gary, Indiana SMSA by the Further Reconsideration Order with language we read as substantially equivalent to that quoted in the text: "all applications for a given market fall due on a date certain," 90 F.C.C.2d at 574 (emphasis added)
 
 
 [9]
 The two authorities cited in footnote 81 also did not serve notice upon La Star. Green County Mobilephone, Inc., 98 F.C.C.2d 593 (1984), rev'd, 765 F.2d 235 (D.C.Cir.1985), could not have provided notice since the Commission's decision issued long after the cut-off for the New Orleans market had passed. The other authority footnote 81 cited, Cellular Order, 86 F.C.C.2d at 509, simply did not speak to the Commission's position at issue here, since it states that a cellular licensee may freely modify its system "as long as it serves the same area," while the sentence itself shows clearly that "same area" means same CGSA
 
 
 [10]
 NITCO also suggests that the cut-off rules are arbitrary and capricious in their preclusion of fill-in applications because they delay cellular service to fringe areas for an indeterminate time. But (1) there is no reason to think that neither of the two licensees in a given SMSA will step in to meet any significant demand for cellular service that emerges in a fringe area; (2) all areas nationally will be open to applications at the end of the Commission's initial course of cellular application processing in any event, see 98 F.C.C.2d at 205; and (3) it is well within the Commission's discretion to focus its limited administrative resources on processing applications for areas that it deems have a higher demand for service. Cf. 47 U.S.C. Sec. 307(b) (1982) (Commission determines which proposal would best "provide a fair, efficient, and equitable distribution of radio service.")