**McELROY ELECTRONICS CORPORATION, et al., Appellants**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee**

**Metro Mobile CTS of Phoenix, Inc., et al., Intervenors.**

Nos. 95–1179, 95–1195, 95–1228, 95–1229 and 95–1307.

United States Court of Appeals, District of Columbia Circuit.

Argued May 16, 1996.

Decided June 21, 1996.

Rehearing Denied Aug. 19, 1996.

Louis Gurman argued the cause, for appellants, with whom William D. Silva, Theresa Fenelon, Anne P. Jones, David A. Gross and Lawrence Roberts, Washington, DC, were on the briefs.

Roberta L. Cook, Counsel, Federal Communications Commission, argued the cause, Washington, DC, for appellee, with whom William E. Kennard, General Counsel, and Daniel M. Armstrong, Associate General Counsel, were on the brief. John E. Ingle, Deputy Associate General Counsel, entered an appearance.

Eliot J. Greenwald, argued the cause and filed the brief, Washington, DC, for intervenors, with whom David J. Kaufman and Donald J. Evans, were on the brief. Douglas I. Brandon, Ray M. Senkowski, Anne P. Jones, David A. Gross, Theresa Fenelon, Richard B. Beckner, Stuart F. Feldstein, Lawrence Roberts, Frances J. Chetwynd and James F. Ireland, III, entered appearances.

Before: BUCKLEY, WILLIAMS and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

In *McElroy Electronics Corp. v. FCC,* 990 F.2d 1351 (D.C.Cir.1993) (*"McElroy I"*), the court ordered the Federal Communications Commission ("Commission") to reinstate *nunc pro tunc* appellants' applications for

licenses to provide cellular telephone service in Los Angeles and Minneapolis. Two years later, the Commission decided that the reinstated applicants would have to enter a lottery with as many as 500 other applicants for the same licenses. Because the record demonstrates that other applicants had fair notice of a sixty-day deadline for filing competing applications, yet did not apply until more than four years after appellants did, we conclude that the Commission erred and we again remand the case to the Commission.

## I.

Appellants seek so-called "unserved-area" licenses. When the Commission first established rules for licensing cellular radiotelephone services, it divided the nation into separate geographic markets, known as metropolitan statistical areas (MSAs) and rural service areas (RSAs), and established two frequency blocks for each market (block A for wireline services and block B for non-wireline services). An applicant could designate a cellular geographic service area (CGSA), encompassing at least 75% of the geographic market, and was required to serve at least 75% of its designated CGSA. The Commission adopted a streamlined comparative-hearing process for the thirty largest MSAs and a lottery process for the other markets. *Cellular Communications Systems*, 86 F.C.C.2d 469 (1981), *order on reconsideration*, 89 F.C.C.2d 58, *order on further reconsideration*, 90 F.C.C.2d 571 (1982); *Cellular Lottery Rulemaking*, 98 F.C.C.2d 175 (1984), *order on reconsideration*, 101 F.C.C.2d 577, *order on further reconsideration*, 59 Rad. Reg.2d (P & F) 407 (1985), *aff'd in part and rev'd in part sub nom. Maxcell Telecom Plus, Inc. v. FCC*, 815 F.2d 1551 (D.C.Cir.1987). In 1987, the Commission adopted a rule providing that each initial licensee could "fill in" unserved areas within its CGSA without being subject to competing applications for five years from the date of the first authorization in that market (changed in 1989 to the date of the particular

licensee's authorization). *Rural Cellular Service*, Second Report and Order, 2 F.C.C. Rcd. 2306 (1987), *order on reconsideration*, 4 F.C.C. Rcd. 5377 (1989); *see* 47 C.F.R. § 22.31(a)(1)(i) (1988).[1] Finally, in 1991, the Commission adopted rules for applications, from either existing licensees or competitors, to serve unserved areas after the initial five-year fill-in period. *Amendment of Part 22 of the Commission's Rules*, First Report and Order, 6 F.C.C. Rcd. 6185 (1991); *Amendment of Part 22 of the Commission's Rules*, Second Report and Order, 7 F.C.C. Rcd. 2449 (1992), *order on reconsideration*, 8 F.C.C. Rcd. 1363 (1993), *aff'd sub nom. Committee for Effective Cellular Rules v. FCC*, 53 F.3d 1309 (D.C.Cir.1995).

Shortly after the five-year fill-in period expired for the Los Angeles Block B license, and before the Commission had formulated its rules for unserved-areas applications, appellant McElroy Electronics Corporation applied to serve unserved areas within the Los Angeles MSA. On August 29, 1988, the Commission issued a public notice in which it noted, among other matters, the McElroy application. Public Notice, Report No. CL–88–154 (Aug. 29, 1988). The first page of the notice bore a preprinted letterhead entitled "Public Notice" and the Commission's address. The typewritten heading read: "COMMON CARRIER PUBLIC CELLULAR RADIO SERVICE INFORMATION." Below that were the date and a report number, followed by the underlined word "Informative." Then came a series of short announcements regarding various applications, each preceded by a file number. McElroy's notice appeared on the fourth page:

> File No. 01758–CL–MP–88
> McElroy Electronics Corporation
> Station NEW
> Market 2B—Los Angeles MSA

An application for a Construction Permit for a new Station for McElroy Electronics Corporation for the Los Angeles M.S.A. § has been filed with the Commission.

---

1. Throughout this opinion, we cite the Commission's rules for cellular licensing in effect when the public notices at issue were published in late 1988 and early 1989. The Commission has since recodified these rules. *Revision of Part 22 of the* *Commission's Rules Governing Public Mobile Services*, 9 F.C.C. Rcd. 6513 (1994). Former §§ 22.26, 22.27 and 22.31 have been recodified in amended form as 47 C.F.R. §§ 22.120, 22.127 and 22.131 (1995), respectively.

The application, File No. 01758–CL–MP– 88 proposes to serve unserved areas in the Los Angeles M.S.A. § on the block B frequencies under Section 22.31(a)(1)(i) of the rules.

(underlining in original). After the last listing, the notice stated: "Interested persons will have thirty (30) days from the date of this notice to submit Comments. Replies may be filed within fifteen (15) days. No further pleadings will be accepted."

Within sixty days of the notice of McElroy's Los Angeles application, appellants Los Angeles SMSA Limited Partnership ("L.A. Partnership") (the incumbent Block B licensee) and JAJ Cellular also applied to serve the unserved areas in Los Angeles. Public Notice, Report No. CL–89–14, at 2 (Oct. 27, 1988); Public Notice, Report No. CL–89–33, at 1 (Nov. 25, 1988). In a notice of December 23, 1988, the Commission listed a total of seven competing applications for Los Angeles Block B that it identified as possibly "mutually exclusive." Public Notice, Report No. CL–89–57, at 12 (Dec. 23, 1988). Appellant Price Communications Cellular filed another competing application more than sixty days after the public notice of McElroy's application.

McElroy filed a similar application following the expiration of the five-year fill-in period for the Minneapolis Block A license, and the Commission published a similar notice of McElroy's application on February 6, 1989. Public Notice, Report No. CL–89–80, at 2 (Feb. 6, 1989). In Minneapolis, the incumbent licensee filed for an unserved-area license just before McElroy's application. Public Notice, Report No.CL–89–75, at 3 (Jan. 31, 1989).

In a series of proceedings, the Commission dismissed all the applications, including the appellants', as premature. *Cellular Applications for Unserved Areas in MSAs/NEC-MAs*, 4 F.C.C. Rcd. 3636 (Common Carrier Bureau 1989), *petitions for reconsideration denied, Amendment of Part 22 of the Commission's Rules*, First Report and Order, 6 F.C.C. Rcd. 6185 (1991). The Commission ruled that, under the *Second Report and Order* in its 1987 rulemaking, once the five-year fill-in period expired, no one could apply for an unserved-area license until the Commission had published a notice of a date certain for filing such applications. *First Report and Order*, 6 F.C.C. Rcd. at 6189–92. Under the rules the Commission adopted for unserved-area applications, it established a one-day "filing window" for each market. *Id.* at 6196–97. For both the Los Angeles and Minneapolis MSAs, the filing window was March 10, 1993. Public Notice, Report No. CL–93–36, at 5 (Dec. 23, 1992). On that date, 517 applicants applied to serve the unserved Los Angeles areas and 494 applicants applied to serve the unserved Minneapolis areas ("the March 10 filers").

One month later, the court decided *McElroy I*. The court concluded that McElroy and the other early applicants had reasonably understood the *Second Report and Order* to mean that unserved area applications would be permitted after the five-year fill-in period had expired without any further action by the Commission. 990 F.2d at 1363. Such applications could be filed according to ordinary Commission practice, in which an applicant can file at any time and other parties may then file competing applications or petition the Commission to deny the first application. While the Commission contended that it had meant to require potential applicants to wait for the Commission to establish a different set of procedures and filing dates, the court held that the *Second Report and Order* had not given adequate notice of that requirement. *Id.* at 1363–64.

By operation of law and by the Commission's established notice and cut-off procedures, the date certain for filing an unserved area application in an M.S.A. § is the first day after the expiration of the protected fill-in period. Since the order did not prescribe specific procedures, such as filing windows, for these applications, petitioners appropriately filed pursuant to the Commission's regular notice and cut-off rules, under which there is no single date for the filing of the first mutually exclusive application. Under this regime, the "date certain" for filing is, therefore, merely an opening date, the date *from which* applications *may* be received, not a

particular date *on which* they *must* be received.

*Id.* at 1363 (emphasis in original) (footnote omitted). The court remanded the case to the Commission with instructions to reinstate the McElroy, L.A. Partnership, and JAJ applications *nunc pro tunc. Id.* at 1364. With respect to Price's application, which came more than 60 days after McElroy's and was therefore possibly time-barred under Commission rules, the court left it to the Commission to determine its fate on remand. *Id.*

Before the Commission acted on remand, McElroy, L.A. Partnership, JAJ, and Price all reached a settlement in which they formed a partnership, appellant Desert Telecommunications Limited Partnership, to serve the unserved areas in Los Angeles, and they petitioned the Commission to accept this settlement and grant the partnership the license. McElroy reached a separate agreement with the incumbent Minneapolis licensee that would reduce interference between the licensee's existing cells and McElroy's proposed cells to acceptable levels, and McElroy moved the Commission for leave to amend its application to reflect the agreement. In considering the remand and the motion to accept the Los Angeles settlement, the Commission first considered whether the public notices announcing McElroy's Los Angeles and Minneapolis applications had commenced a sixty-day cut-off period pursuant to 47 C.F.R. § 22.31(b)(2)(i) (1988). *In re McElroy Electronics Corp.,* 10 F.C.C. Rcd. 6762 (1995) *(Remand Order).* If so, then the March 10 filers, whose applications had been filed four years after the notices were published, would not be entitled to compete with appellants for the Los Angeles or Minneapolis unserved-area licenses. The Commission ruled, however, that

> [n]either the public notice announcing the applications of the three reinstated Appellants [McElroy, L.A. Partnership, and JAJ] nor the public notice announcing Price's application established a deadline for competing applications. The 1988 and 1989 public notices did not meet the standards articulated in our Rules for establishing a valid "cut-off" date because the public notices did not specify that the applications had been "accepted for filing," as required by both the Act and the Rules. *See* [47] U.S.C. § 309(b)(1) and 47 C.F.R. [§] 22.26(b). Thus, the public notices did not establish cut-off dates.

*Id.* at 6765–66. The Commission therefore decided to conduct a lottery in accordance with the rules established in the *First Report and Order,* with the successful *McElroy I* appellants in the same pool as the March 10 filers.[2] *Id.* at 6766. In other respects, the Commission decided not to apply retroactively to the appellants rules developed after they filed their applications.[3] This appeal followed.[4]

**2.** On April 15, 1996, the Commission announced its intention to conduct lotteries for Los Angeles Block B and Minneapolis Block A on June 11, 1996, but expressly stated in the "Lottery Notice" that "[a]ny license granted in either of these markets following the lottery will be conditioned on the outcome" of the instant appeals.

**3.** The *McElroy I* court ordered the Commission to consider on remand whether to apply retroactively the changes made to its rules for unserved-area license applications since appellants' applications were accepted for filing. 990 F.2d at 1365. The most important such changes were that the five-year fill-in period runs from the date of authorization for the particular licensee (rather than for the first licensee in the market), *see* 47 C.F.R. § 22.31(a)(1)(i) (1993), and that the method of determining the boundaries of a licensee's CGSA was altered in a way that tends to enlarge incumbents' territories, *see id.* § 22.903 (1993). The Commission found in its *Remand Order* that the change in measuring the fill-in period had no effect in the Los Angeles or Minneapolis MSAs, 10 F.C.C. Rcd. at 6768, and decided that it would not apply the new CGSA definition retroactively to the appellants' applications, *id.* at 6773–74.

**4.** The L.A. Partnership initially filed a notice of appeal and moved for partial reconsideration of the Commission's order; it subsequently withdrew its administrative petition and filed a second notice of appeal. We held that the second notice of appeal was filed in a timely manner. *Los Angeles SMSA Ltd. Partnership v. FCC,* 70 F.3d 1358 (D.C.Cir.1995) (per curiam). The *McElroy I* decision and the *Remand Order* also deal with applications by McElroy and JAJ for the Phoenix M.S.A. § Block A. *Cf. JAJ Cellular v. FCC,* 54 F.3d 834 (D.C.Cir.1995) (denying a challenge by McElroy and JAJ to the Commission's decision to authorize the existing Phoenix licensee to provide interim service). Because all the affected parties in the Phoenix market have reached a settlement that may moot that portion

## II.

When two parties apply for mutually exclusive licenses, the Commission must hold a comparative hearing before granting either application.[5] *Ashbacker Radio Corp. v. FCC,* 326 U.S. 327, 333, 66 S.Ct. 148, 151, 90 L.Ed. 108 (1945). The Commission has promulgated various "cut-off" rules that establish deadlines by which applications must be filed in order to be considered for *Ashbacker* hearings. "The purpose of these rules is to attract all competitive applications for a particular [frequency] within a fixed and reasonably short time frame, allowing the Commission to satisfy its *Ashbacker* obligations with a single, fairly prompt comparative hearing." *Florida Inst. of Tech. v. FCC,* 952 F.2d 549, 550 (D.C.Cir.1992). Pursuant to the notice and cut-off procedure under which the applications at issue in the instant case were filed, competing applicants were entitled to participate in a comparative hearing or lottery only if they filed their applications within "[s]ixty (60) days after the date of the public notice listing the first of the conflicting applications as accepted for filing." 47 C.F.R. § 22.31(b)(2)(i) (1988).[6] Appellants contend that the Commission improperly permitted the March 10 filers to participate in lotteries for the unserved-area licenses even though they did not file their applications within 60 days of the public notices announcing the filing of McElroy's applications. *See Florida Inst. of Tech.,* 952 F.2d at 554 (noting that timely filers "have a legitimate expectation that the cut-off rules will be enforced"); *City of Angels Broadcasting, Inc. v. FCC,* 745 F.2d 656, 663 & n. 7 (D.C.Cir.1984) (same).

The Commission's position is difficult to determine in light of the terse discussion of the issue in the *Remand Order.* There is no dispute that the Commission staff did in fact accept the appellants' applications for filing;[7] the issue is whether the public notices gave sufficient notice of that fact to cut off third parties' rights. The Commission's order suggests that the public notices at issue must have fallen into one of two categories: notices of an "acceptance for filing" that started a cut-off period; or instead purely informational notices that "d[id] not create any rights in an applicant or any other person." 47 C.F.R. § 22.27(a)(1), (3) (1988).[8] In its

---

of the appeals, we remanded the portion of the record dealing with the Phoenix market to the Commission on February 29, 1996.

5.   Since the decision in *Ashbacker,* Congress has authorized the Commission to decide among mutually exclusive applications by lottery or auction. 47 U.S.C. § 309(i), (j) (1994).

6.   Section 22.31(b) of the Commission's regulations provided at the time:

An application will be entitled to comparative consideration with one or more conflicting applications (and, in specified services in this rules part [47 C.F.R. pt. 22], included in a random selection process) only if:
(1) The application is mutually exclusive with the other application; and
(2) The application is received by the Commission for filing in a condition acceptable for filing by whichever "cut-off" date is earlier:
(i) Sixty (60) days after the date of the public notice listing the first of the conflicting applications as accepted for filing; or
(ii) One (1) business day preceding the day on which the Commission takes final action on the previously filed application (should the Commission act upon such application in the interval between thirty (30) and sixty (60) days after the date of its public notice).

7.   In its *First Decision and Order,* the Commission conceded that its staff accepted the applications for filing but asserted that "[t]he fact that the Bureau initially (and erroneously) accepted the applications for filing does not bind either the Bureau or the Commission. *See* 47 C.F.R. Section 22.26(b)." 6 F.C.C. Rcd. at 6191 n.9; *see also* 4 F.C.C. Rcd. at 3636 n.5. Under the Commission's rules, "[a]cceptance for filing merely means that it has been the subject of a preliminary review as to completeness," and the Commission does not deny that such a preliminary review took place. 47 C.F.R. § 22.26(b) (1988).

8.   Section 22.27(a) provided at the time:

At regular intervals, the Commission will issue a public notice listing:
(1) The acceptance for filing of all applications and major amendments thereto;
(2) Significant Commission actions concerning applications listed as acceptable for filing;
(3) Information which the Commission in its discretion believes of public significance. Such notices are solely for the purpose of informing the public and do not create any rights in an applicant or any other person.
(4) Special environmental considerations as required by Part 1 of this chapter [47 C.F.R. pt. 1].

brief, however, the Commission has clarified its view that it does not matter whether the notices technically fell into the informational category defined by 47 C.F.R. § 22.27(a)(3), but rather whether they clearly advised potential competitors that a cut-off date had been established. Even if the staff intended to publish § 22.27(a)(1) notices, in other words, the notices as published did not meet that subsection's requirements. The Commission's order maintained that publication of the notices could not meet the definition of notice of an "acceptance for filing" because "the public notices did not specify that the applications had been 'accepted for filing,' as required by both the Act and the Rules." *Remand Order,* 10 F.C.C. Rcd. at 6765 (citing 47 U.S.C. § 309(b)(1), 47 C.F.R. § 22.26(b) (1988)). Because in the Commission's view the 1988–1989 notices were not "public notice[s] listing the first of the conflicting applications as accepted for filing," 47 C.F.R. § 22.31(b)(2) (1988), they "did not establish cut-off dates" by which conflicting applications must be received. *Remand Order,* 10 F.C.C. Rcd. at 6766.

### A.

Before turning to these arguments, we address appellants' suggestion that the Commission's ruling on remand was barred by the *McElroy I* mandate. In *McElroy I,* the court carefully limited its holding, however, preserving the Commission's authority to decide in the first instance how to treat the applications. "At this juncture, we determine only the threshold question of reinstating the petitions, not the proper means of processing those applications." 990 F.2d at 1358. The court declined to reach the very issue pressed again in the instant appeal. In *McElroy I,* McElroy and JAJ argued that Price's application, which had been filed more than sixty days after the public notice of McElroy's Los Angeles application, must be barred. Reply Brief of Appellants McEl-

roy Electronics Corp. & JAJ Cellular at 10–13, *McElroy I* (No. 91–1545). Price contended that the notice had been inadequate to trigger a cut-off period, Brief of Petitioner Price Communications Cellular, Inc. at 11–14, *McElroy I* (No. 91–1545), and the Commission in its brief declined to address the issue, Brief of Appellee/Respondent Federal Communications Commission at 20 n.19, *McElroy I* (No. 91–1545). The court noted the issue, but left it "to the Commission to determine on remand the timeliness of Price's application within the context of our discussion as to the comprehensible meaning of the *Second Report and Order.*" 990 F.2d at 1364. Even more specifically, the court mentioned the absence of the words "accepted for filing" from the public notice and stated: "On remand, the Commission will have the opportunity to consider the pertinence of that fact in this context." *Id.* at 1364 n. 13. Thus, the Commission was not prohibited by the *McElroy I* mandate from deciding that the cut-off period never started.

### B.

▮ The Commission held in its *Remand Order* that the public notices at issue did not cut off third parties' rights because they "did not specify that the applications had been 'accepted for filing,' as required by both the Act and the Rules. *See* [47] U.S.C. § 309(b)(1) and 47 C.F.R. [§] 22.26(b)." 10 F.C.C. Rcd. at 6765. We will defer to the Commission's interpretation of its own regulations unless it is plainly erroneous or inconsistent with the regulation. *Omnipoint Corp. v. FCC,* 78 F.3d 620, 631 (D.C.Cir. 1996). Even in view of the Commission's broad discretion to interpret its regulations, however, we conclude that its interpretation is impermissible. First, it is unclear whether the Commission intended to rely on § 22.26(b), which sets forth the procedures for acceptance of an application for filing,[9]

**9.** Section 22.26 of the Commission's regulations provided at the time:

(a) Applications received for filing are given a file number. The assignment of a file number to an application is merely for administrative convenience and does not indicate the acceptance of the application for filing and

processing. Such assignment of a filing number will not preclude the subsequent return or dismissal of the application if it is found to be not in accordance with the Commission's rules.

(b) Acceptance of an application ·for filing merely means that it has been the subject of a

rather than on § 22.31(b), which establishes a cut-off period that begins with the publication of a "public notice listing the first of the conflicting applications as accepted for filing." Yet this oversight is not fatal, given that the Commission did cite § 22.31(b) when it first mentioned the cut-off rule. *Remand Order,* 10 F.C.C. Rcd. at 6765.

Assuming that the order was directed toward the relevant regulation, the Commission's reasoning under the circumstances of this case is nevertheless flawed. The relevant language in § 22.31 is virtually identical to that in § 309(b) of the Act; the former refers to a notice "listing the first of the conflicting applications as accepted for filing," while the latter refers to "issuance of public notice by the Commission of the acceptance for filing of such application." The thirty-day period in § 309(b) is not directly relevant to the instant case, given that it simply requires the Commission to wait thirty days before granting appellants' applications. Yet the Commission's statement in the *Remand Order* that § 309(b) requires inclusion of the phrase "accepted for filing" is belied by the Commission's prior practice. As appellants point out, the Commission routinely used public notices essentially identical to the public notices at issue to announce applications by incumbent licensees during the five-year fill-in period.[10] For example, in the same public notice that contained JAJ's Los Angeles application, the Commission gave notice of a fill-in application by the Phoenix M.S.A. § Block B licensee, Public Notice, Report No. CL–89–33, at 2 (Nov. 25, 1988); when no objections were filed, the Commission granted the application, Public Notice, Report No. CL–89–80, at 4 (Feb. 6, 1989). All parties agree that the Commission was not authorized to grant such an application until thirty days after publishing the notice required in § 309(b). Because the record shows that the Commission regularly granted fill-in applications after publishing notices that did not contain the magic phrase "accepted for filing," its interpretation of the Act in the contested order is plainly inconsistent with its established practice.[11]

Thus, the statute does not require that the notice contain the phrase "accepted for filing." The question in the instant case is whether the regulations differ from the statute by adding such a requirement. The Commission has supplied no reason to interpret the public-notice requirement in § 22.31(b) differently from that in § 309(b); nor can we see any reason to construe the regulation differently from the statute. Because the Commission's interpretation conflicts with its interpretation of similar language in the Act and is unsupported by any analysis, we cannot defer to it. The fact that the public notices did not contain the phrase "accepted for filing" does not prevent the cut-off period from commencing by operation of law.

### C.

The Commission has presented in its brief a line of analysis that harmonizes the Commission's order with its prior practice. What both the rules and the Act require, according to the brief, is a notice containing *either* the phrase "accepted for filing" *or* an express notification of what deadlines are being established by the notice. The purpose of the notice requirement is to afford interested parties adequate notice that their rights are implicated. This can be done either by expressly listing a cut-off date or by using a term of art like "accepted for filing" that will lead such parties to the text of the relevant statutes and rules.

preliminary review as to completeness. Such acceptance will not preclude the subsequent return or dismissal of the application if it is found to be defective or not in accordance with the Commission's rules. (See § 22.13 for additional information concerning filing of applications).

**10.** On February 13, 1996, we granted appellants' motion requesting the court to take judicial notice of previous public notices.

**11.** The Commission's use of notices bearing the same "informative" label to satisfy § 309(b)'s notice requirement for fill-in applications shows that the same "informative" label on the public notices at issue here should not have been understood by an informed reader to show that the notices were merely informational notices that did not "create any rights in an applicant" under Commission rules. 47 C.F.R. § 22.27(a)(3) (1988).

The attraction of this analysis is that it explains away the apparent conflict between the interpretation of § 309(b) that the Commission asserted in its order and its routine practice of granting incumbent fill-in applications after publishing notices that do not contain the magic words. These notices, while not stating that a fill-in application has been "accepted for filing," do state that comments must be filed within 30 days of the notice. According to the argument, this satisfies § 309(b)'s prohibition against granting an application until 30 days after publication of a notice that the application has been accepted for filing. The purpose of that prohibition is to give other parties a period in which to file petitions to deny the application. *In re Palm Bay Pub. Radio, Inc.*, 6 F.C.C. Rcd. 1772, 1773 (1991), *aff'd sub nom. Florida Inst. of Tech. v. FCC*, 952 F.2d 549 (D.C.Cir.1992). Thus, by expressly warning that "comments" must be submitted within 30 days, the Commission contends, the fill-in notices fulfill the function required by § 309(b). Because no other party may file a competing application during the fill-in period, the Commission is not required to give a separate warning that a cut-off period for *Ashbacker* purposes is being established. By contrast, says the Commission, appellants' unserved-area applications were subject to mutually exclusive filings, so potential competitors could not be cut off without receiving explicit notice that the sixty-day cut-off period was starting.

Appellants dispute the factual basis for the Commission's position, claiming that there have been instances in which the Commission enforced cut-off periods based on public notices that neither contained the phrase "accepted for filing" nor expressly announced a filing deadline for competing applications. This is not as clear as appellants suggest. The public notice at issue in *Reuters Ltd. v. FCC*, 781 F.2d 946 (D.C.Cir.1986), did state that the listed applications had been "accepted for filing." Public Notice, Report No. 1182, at 1, 4–5 (Aug. 12, 1983). In *Maxcell*, in which the public notice did not list a cut-off date, Public Notice, Report No. CL–23 (Aug. 17, 1983), the Commission did not cut

off a competing applicant for filing after the sixty-day period; instead, the court required the Commission to reinstate the application of a competing applicant who had filed within the sixty-day period. 815 F.2d at 1560. In *In re Metro Mobile CTS, Inc.*, 8 F.C.C. Rcd. 8675, 8676 (1993), *aff'd sub nom. JAJ Cellular v. FCC*, 54 F.3d 834 (D.C.Cir.1995), the Commission entertained McElroy's petition to deny when it had published a notice similar to the ones at issue here for an unserved-area application by the incumbent licensee in Phoenix M.S.A. § Block A, Public Notice, Report No. CL–89–66, at 2 (Jan. 23, 1989), and McElroy had filed a competing application, Public Notice, Report No. CL–89–80, at 2 (Feb. 6, 1989). Yet the *Metro Mobile* public notice contained a statement of the statutory thirty-day period for petitions to deny, and the Commission later determined that the five-year fill-in period had in fact not ended, so that the incumbent licensee's application was treated as a fill-in application not subject to competing applications. *Remand Order*, 10 F.C.C. Rcd. at 6762.

Nevertheless, it is clear that the Commission's analysis in its brief bears little resemblance to the rationale of the Commission in the appealed order. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 459–60, 87 L.Ed. 626 (1943). Only a most charitable reading of the *Remand Order* could reveal this meaning. The Commission framed the issue as whether the public notices "established a valid deadline or 'cut-off' date for the filing of competing applications." 10 F.C.C. Rcd. at 6765. Then the Commission reasoned that the notices did not "establish[ ] a deadline for competing applications" and "did not meet the standards articulated in our Rules for establishing a valid 'cut-off' date because the public notices did not specify that the applications had been 'accepted for filing.'" *Id.* Perhaps the Commission intended to convey, however obliquely, that there were two possible ways for the notices to be effective: *either* they could have expressly listed a deadline for competing applications *or* they could have invoked the cut-off period in § 22.31(b) by including the phrase "accepted for filing." [12]

12.  Contrary to appellants' view that *Reuters*

stands for the proposition that a cut-off date can

Even if the Commission's order could be read to include the rationale now advanced by its counsel, that rationale is inconsistent with this circuit's case law. The notice and cut-off procedure serves the public's interest in administrative finality and prompt issuance of licenses. Furthermore, as against latecomers, timely filers who have diligently complied with the Commission's requirements have an equitable interest in enforcement of the cut-off rules. *Florida Inst. of Tech.*, 952 F.2d at 554; *City of Angels*, 745 F.2d at 663. To serve these purposes, the court has frequently affirmed the Commission's strict enforcement of its rules. *See Florida Inst. of Tech.*, 952 F.2d at 550 (citing *Salzer v. FCC*, 778 F.2d 869, 875 (D.C.Cir.1985)). Moreover, the Commission may not decline to enforce its deadlines so long as the rules themselves are clear and the public notice apprises potential competitors of a mutually exclusive application. *Reuters*, 781 F.2d at 949–51 & n. 5. In light of these precedents, the public notices of McElroy's applications should have put a reasonably diligent interested party on notice that its rights were at stake.

As the Commission's counsel noted at oral argument, the Commission was caught between two groups of applicants with legitimate interests. The issue is who should lose on account of what the Commission now considers to have been an error by its staff in giving less than perfect notice of its acceptance for filing of the unserved-area applications. The Commission's analysis—at least as refined in its argument to the court—pays admirable attention to the right of the March 10 filers to have adequate notice before their rights were cut off, but fails to recognize that that right would be—and was—satisfied so long as the Commission's actions gave them notice of the cut-off date that was "reasonably comprehensible to people of good faith." *McElroy I*, 990 F.2d at 1358; *see also Hispanic Info. & Telecommunications Network, Inc. v. FCC*, 865 F.2d 1289, 1295–96 (D.C.Cir. 1989); *Maxcell*, 815 F.2d at 1559–60; *Radio*

*Athens, Inc. v. FCC*, 401 F.2d 398, 404 (D.C.Cir.1968). Several features of the McElroy notices, in conjunction with § 22.31(b) of the Commission's rules, show that interested parties acting in good faith should have understood that a deadline had been established.

Most important, the notice could not have been reasonably understood as announcing anything other than an application by a non-incumbent licensee for an unserved-area license in Los Angeles on Block B. The notice stated, in underlined words no less, that McElroy "proposes to serve unserved areas in the Los Angeles M.S.A. § on the block B frequencies under Section 22.31(a)(1)(i) of the rules." Public Notice, Report No. Cl–88–154, at 4. If the words were not clear enough, the interested reader could have referred to the cited regulation, which applies only to "applications by other than licensees or permittees for a Metropolitan Statistical Area (MSA) to serve unserved areas outside the presently authorized CGSA but within the MSA." If the reader happened to be interested in serving the Los Angeles MSA, the reader could also be expected to know from prior public notice, *see In re Advanced Mobile Phone Serv., Inc.*, 93 F.C.C.2d 683 (1983), that L.A. Partnership's five-year exclusive fill-in period as the Los Angeles M.S.A. § Block B incumbent had ended in late April 1988. Interest surely piqued by now, the potential competitor would continue to read the notice and discover that the Commission would accept comments on the application for only thirty days. Nor would the reader have to go to the trouble of checking the Act to learn what might happen when those thirty days elapsed, for the notice went on to list no fewer than three other applications, previously placed on public notice, that had been granted because "[t]he Commission has not received any objection to the application." Public Notice, Report No. CL–88–154, at 6. Of course, were McElroy's application granted, the reader's dream of constructing cells in Los Angeles's unserved areas on the

---

be established only by operation of the Commission's regulations, *Reuters* holds that a public

notice need not expressly state a cut-off date

same frequency block would be dashed.[13] It is difficult to escape the conclusion that a minimally diligent competitor would have recognized the need to take action in response to the notice. *Cf. Hispanic Info. & Telecommunications Network,* 865 F.2d at 1295–96.

The Commission and intervenors contend, however, that a competitor familiar with the *Second Report and Order* might reasonably have believed that the Commission was not yet accepting unserved-area applications, and might therefore have discounted the clear import of the notice. Recall that the Commission itself interpreted the *Second Report and Order* to bar unserved-area applications, even after the five-year fill-in period had expired, until the Commission had established procedures and announced a filing date. The intervenors say that they interpreted the order as the Commission had intended, and that their "careful reading of the *Second Report and Order* led them to await further instruction by the Commission, rather than file premature applications" after the McElroy notice appeared. Brief for Intervenors at 6. The intervenors rely on *McElroy I*'s purported holding that the *Second Report and Order* was ambiguous and contend that they should not be punished for the Commission's poor drafting any more than should the appellants. We are unpersuaded.

First, the assertion that *McElroy I* found the *Second Report and Order* ambiguous is at best debatable. The court did not state that appellants' reading was one among several reasonable interpretations of the order; it stated that it was the most reasonable interpretation. The court agreed with appellants that "the most logical way to read" the *Second Report and Order* was "that, once the five-year moratorium elapsed, the established notice and cut-off procedures would operate." 990 F.2d at 1360. In fact, the only portion of the *Second Report and Order* that the court deemed "ambiguous" was footnote 17, the very part that the intervenors now claim most clearly supports their interpretation. *Id.* at 1361, 1363 n. 12. The irony of the intervenors' position is manifest: they seek vindication of their claimed understanding of the *Second Report and Order* at the expense of that of appellants. Yet appellants necessarily have the better of this argument after *McElroy I.* The premise of the intervenors' argument is thus shaky at best.

Even accepting that premise, however, the public notices still should have alerted a diligent competitor that an immediate response was required. *See Florida Inst. of Tech.,* 952 F.2d at 553–54 (finding tardy competitor's lack of diligence tipped equities in favor of early filer). As discussed previously, there is no way to understand the McElroy notices as referring to anything other than unserved-area applications. Even a competitor who had been patiently biding its time, awaiting an invitation from the Commission to apply, would have realized that the call to arms had come. This would be true enough if only one notice had been published, but as more appeared in the regular public notices over the succeeding weeks, no reasonable person interested in competing for the Los Angeles or Minneapolis unserved-area licenses could have clung to a belief that the proper approach was to keep quiet and wait.[14] The

---

when the Commission's regulations provide one. *Reuters,* 781 F.2d at 950 n. 5.

**13.** The McElroy notice clearly contained sufficient data to apprise prospective competitors of the fact that McElroy's application would be exclusive of theirs.

> [T]he long accepted practice of the [Common Carrier] Bureau has been to include the file number, name of applicant, call sign (if any), nature of the application, frequency and location. Of these factors, it is absolutely essential for a prospective applicant to be apprised of the location and the specific frequency of the facilities for which authorization is sought. Without this information, a prospective appli-

cant would not be able to determine whether a specific proposal will be mutually exclusive with an application already on file, and therefore, an application must be filed before the cut-off deadline to be eligible for comparative consideration.

*In re Central Mobile Radio Phone Service,* 65 F.C.C.2d 648, 651 (1977). Each of the public notices involved in the instant case contained all of the *Central Mobile* information.

**14.** The record shows that some interested persons responded to the notices by petitioning the Commission to deny the applications as premature. *In re Cellular Applications for Unserved Areas in MSAs/NECMAs,* 4 F.C.C. Rcd. at 3636.

requirement to act promptly should have been easily comprehensible to people of good faith.

For these reasons we conclude that the public notices at issue started a sixty-day cut-off period, and that the March 10 filers are not entitled to compete against their more timely rivals.[15] Accordingly, we must remand the case once more to the Commission with instructions to dismiss the applications of the March 10 filers. The Commission must decide in the first instance how to resolve the proposed full-market settlement for the Los Angeles M.S.A. § and McElroy's

agreement with the Minneapolis M.S.A. § incumbent.[16] Because the applications have been pending for almost eight years, due to no apparent fault of appellants, it is to be hoped that the matter will be resolved forthwith.

---

Inasmuch as petitions to deny may not be filed until after public notice that an application has been accepted for filing, 47 U.S.C. § 309(d), we can only assume that those protesting understood the notices so to indicate.

15. Appellant Price also filed after the cut-off date, and its after-filed application is similarly barred. We remand to the Commission to determine what rights Price may have under its June 16, 1994, settlement agreement with the other appellants to form Desert Telecommunications Limited Partnership.

16. In the *Remand Order,* the Commission noted that when the appellants filed their applica-

tions, the Commission did not yet have rules in place for whether unserved-area licenses would be allocated by comparative hearing or by lottery. Given that the Commission had allocated all licenses by lottery since 1984, *see Cellular Lottery Rulemaking,* 98 F.C.C.2d 175 (1984), the Commission decided that "Appellants have no equitable claim to comparative hearings." 10 F.C.C. Rcd. at 6766. Appellants have not appealed this aspect of the *Remand Order.*