**BACHOW COMMUNICATIONS, INC., et al., Appellants/Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Appellees/Respondents.**

Columbia Millimeter Communications,
L.P., et al., Intervenors.

Nos. 99–1346, 99–1347, 99–1360
to 99–1365, 99–1391 to 99–
1394 and 99–1533.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 1, 2000.

Decided Feb. 6, 2001.

Robert L. Corn–Revere argued the cause for appellants/petitioners. With him on the briefs were Catherine E. Stetson, Walter H. Sonnenfeldt, Robert J. Keller, Thomas J. Dougherty, Jr., Christa M. Parker, Louis Gurman, and E. Ashton Johnston. Doane F. Kiechel III entered an appearance.

Pamela L. Smith, Counsel, Federal Communications Commission, argued the cause for appellees/respondents. With her on the briefs were Christopher J. Wright, General Counsel, Daniel M. Armstrong, Associate General Counsel, Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson and Andrea Limmer, Attorneys. Roberta L. Cook, Counsel, entered an appearance for appellee Federal Communications Commission.

Before: EDWARDS, Chief Judge, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The issues in these consolidated cases center on the Federal Communications Commission's conversion of its system for awarding licenses in the 39 GHz (gigahertz) band from a comparative application process to a public auction. The 39 GHz band, comprising the 38.6 to 40.0 GHz frequencies on the electromagnetic spectrum, appears to have attracted little commercial interest until the mid–1990s, when newly developed technology became available. Until late 1995, the Commission processed non-mutually exclusive applications (that is, applications having no competition for the same frequency and territory),[1] but resolved mutually exclusive applications by holding a comparative hearing.

Increased commercial interest in the 39 GHz band rendered the comparative application system impracticable. From January to November 1995 alone, the Commission received more than 2,100 applications for licenses. In late 1994 the Commission also received a telecommunications industry association petition for rulemaking. In response to the petition and the growing number of applications, the Commission considered changing its method of allocating licenses and eventually adopted a competitive bidding system.

The Commission commenced the transition on November 13, 1995, by imposing, without notice and opportunity for comment, an application freeze. *See* 11

---

1. *See, e.g.,* 47 C.F.R. § 101.45(a) ("the Commission will consider applications to be mutually exclusive if their conflicts are such that the grant of one application would effectively preclude by reason of harmful electrical interference, or other practical reason, the grant of one or more of the other applications").

F.C.C.R. 1156 (Nov. 13, 1995). In the course of two Notices of Proposed Rulemaking and two reconsideration orders issued between December 1995 and July 1999, the Commission implemented interim licensing procedures and disposed of applications still pending under the comparative application system. It dismissed without prejudice applications that were not filed at least 30 days before the November 13, 1995, freeze date, or, in Commission parlance, that were not "ripe." It also dismissed "ripe" applications—those filed at least 30 days before the freeze date—that were mutually exclusive with other applications on the freeze date and whose mutual exclusivity had not been resolved by amendment or voluntary dismissal by December 15, 1995, the cut-off date for amendments. *See* 11 F.C.C.R. 4930 (Dec. 15, 1995); 12 F.C.C.R. 2910 (Jan. 17, 1996); 12 F.C.C.R. 18,600 (Nov. 3, 1997); 14 F.C.C.R. 12,428 (July 29, 1999). Conversely, the Commission processed applications filed at least 30 days before November 13, 1995, and that were not mutually exclusive on that date or that had their mutual exclusivity resolved by amendment or voluntary dismissal by December 15, 1995.[2]

### I.

The private parties—the appellants and petitioners—object to the Commission's dismissal of their pending applications, to the 30–day ripeness period, and to the amendment cut-off. They do not contest the application freeze itself or the Commission's adoption of a competitive bidding system.

#### A. Dismissal of Applications

Once the Commission decided to adopt new licensing rules for the 39 GHz band, it had to choose the effective date of the rules and dispose of applications still pending under the old regime. As appellants see it, the Commission's decision to dismiss all pending mutually exclusive applications was arbitrary and capricious. Naturally, they hoped to avoid having to start the application process all over again in a public auction. We have, however, recognized the Commission's authority to change license allocation procedures midstream. *See Maxcell Telecom Plus, Inc. v. FCC,* 815 F.2d 1551 (D.C.Cir.1987) (upholding change from comparative application system to lottery); *DIRECTV, Inc. v. FCC,* 110 F.3d 816 (D.C.Cir.1997) (upholding change from pro rata distribution policy to competitive bidding).

■ In deciding to dismiss applications that either did not satisfy the 30–day ripeness requirement or were mutually exclusive, the Commission balanced the need to implement the new regulatory regime against the effect of upsetting the expectations of appellants and others. We perceive no error in its resolution of these opposing interests. The Commission reasonably feared that processing mutually exclusive applications under an antiquated and burdensome comparative application system would diminish the efficiency gains expected from competitive bidding. *See* 12 F.C.C.R. at 18,642.

In appellants' view, their side of the balance weighs much heavier because they obtained rights against prospective competitors who were foreclosed from applying by the Commission's cut-off rules. Under rules existing when appellants filed, public notice of the filing of the first application for a given license triggered a 60–day filing window; that is, competing applicants had to file within 60 days of the public notice or lose their right to file. *See* 47 C.F.R. § 21.31(b)(2)(i) (1995).[3] Several

---

**2.** The Commission made other changes to the licensing system not relevant to this appeal. For example, it replaced applicant-defined rectangular service areas with Commission-defined geographic areas. *See* 12 F.C.C.R. at 18,610.

**3.** The filing rule also provided a shorter time period, but not less than 30 days, in cases where the Commission "takes final action on the previously filed application." 47 C.F.R. § 21.31(b)(2)(ii) (1995).

applicants for 39 GHz licenses filed more than 60 days before the freeze order, yet saw their applications dismissed because of mutual exclusivity. Upon reaching the sixtieth day following public notice of the first application but before the freeze order, the filing rule theoretically should have closed the application pool to competing filers, protecting these applications from additional competition. Appellants complain that the application freeze and subsequent dismissal of pending mutually exclusive applications defeated the cut-off rule by permitting people who would have been closed out of applicant pools in the comparative application system to bid for the same licenses in the public auction.[4] In their words, "the Commission's decision effectively required pending mutually exclusive applicants to bid against new applicants filing years after the established cut-off dates." Brief for Appellants at 58.

Appellants claim that *McElroy Electronics Corp. v. FCC*, 86 F.3d 248 (D.C.Cir. 1996), renders the Commission's actions arbitrary. *See* Brief for Appellants at 57–60. In *McElroy*, we recognized that "as against latecomers, timely filers who have diligently complied with the Commission's requirements have an equitable interest in enforcement of the cut-off rules." 86 F.3d at 257. That equitable interest arose in circumstances not present here. The appellants in *McElroy* filed cellular applications even though the Commission had not yet formulated rules for those licenses. *See id.* at 250. The Commission dismissed the applications as premature and later established a one-day filing window. On the filing date, which was approximately five years after the appellants had filed, 517 applicants filed for the Los Angeles licenses and 494 filed for the Minneapolis

licenses. *See id.* at 251. The first time *McElroy* came to this court, we ordered the Commission to reinstate, *nunc pro tunc*, the applications previously dismissed as premature. *See McElroy Elec. Corp. v. FCC*, 990 F.2d 1351 (D.C.Cir.1993). The Commission then decided that the reinstated applicants would have to enter a lottery with those who filed under the later one-day window, reasoning that the public notices announcing appellants' applications did not establish a deadline for competing applications. *See* 86 F.3d at 252. We reversed, citing the Commission's "notice and cut-off procedure under which the applications at issue ... were filed, [wherein] competing applicants were entitled to participate in a comparative hearing or lottery only if they filed their applications within 'sixty (60) days after the date of the public notice listing the first of the conflicting applications as accepted for filing'." *Id.* at 253. The issue was "whether the public notices gave sufficient notice of [the Commission's acceptance of appellants' applications for filing] to cut off third parties' rights." *Id.* We found the public notice sufficient to trigger the 60-day cut-off period. *See id.* at 257.

■ *McElroy* stands for the proposition that the Commission must follow its own rules. *See, e.g., Reuters Ltd. v. FCC*, 781 F.2d 946, 950 (D.C.Cir.1986). It does not create some generalized right to exclude competitors. The "equitable interest" in *McElroy* was the applicants' interest in the Commission *enforcing* its filing and notice rules, not an interest in preventing the Commission from *changing* them. As we have recognized before, the Commission may make midstream rule adjustments, even though it disrupts expectations and

---

4. We doubt whether 39 GHz licenses in the public auction are really the same as the licenses in the comparative application system. As noted previously, the Commission changed the manner in which it designated service areas for those licenses, in part to reduce mutual exclusivity problems. *See supra* note 2; 12 F.C.C.R. at 18,610. Because an application pool consists of a set of mutu-

ally exclusive applications or chains of mutually exclusive applications, *see* 47 C.F.R. § 21.31(b) (1995), licensing changes that alter mutual exclusivity presumably will also alter application pools. In any event, we find the Commission's dismissal of pending mutually exclusive applications lawful regardless of the identity of licenses in the comparative application and competitive bidding systems.

alters the competitive balance among applicants. *See Maxcell*, 815 F.2d 1551; *DIRECTV*, 110 F.3d 816.

■ Moreover, any interest in enforcement of cut-off rules is just that—an interest, not a vested right: "timely applicants have no 'vested right against challenge from untimely competitors,' in the sense of precluding the FCC from ever granting a cut-off waiver, but they certainly have an equitable interest whose weight it is 'manifestly within the Commission's discretion to consider'." *Florida Inst. of Tech. v. FCC*, 952 F.2d 549, 554 (D.C.Cir.1992). The Commission's authority to change rules that affect pending applications is bounded by principles of retroactivity, not by an abstract interest in excluding competitors. *McElroy* holds only that if the Commission decides to process timely applications, it generally may not also process competing applications filed out of time. The case does not govern the present situation in which the Commission decides, without violating its rules, not to process pending mutually exclusive applications at all.[5]

Even if *McElroy* stood for all that appellants read into it, they could not have obtained any "equitable interest" to immunize their applications against dismissal. The most they could have obtained is the relief we granted in *McElroy*—an order requiring dismissal of applications filed after the cut-off date. *See* 86 F.3d at 259. *McElroy* does not require the Commission to process all applications pending under an obsolete license allocation system just because applicants who were otherwise cut off might re-apply in a new system.[6]

## B. The Ripeness Period

■ The Commission imposed a ripeness period co-extensive with the time period in which competitors had the right to file competing applications. The point apparently was to avoid granting applications under the old system when the time period for others to file a mutually exclusive application had not yet expired. The Commission originally used a 60-day period, representing the period during which prospective applicants could file competing applications under the Commission's rules.

5. In Title III of the Balanced Budget Act of 1997, Congress amended the Communications Act to include a right to exclude competitors. *See* Pub.L. No. 105–33, § 3002(a)(3), 111 Stat. 251, 260 (1997) (codified at 47 U.S.C. § 309($l$)). That provision states: "With respect to competing applications for initial licenses or construction permits for commercial radio or television stations that were filed with the Commission before July 1, 1997, the Commission shall (1) have the authority to conduct a competitive bidding proceeding pursuant to subsection (j) to assign such license or permit; [and] (2) treat the persons filing such applications as the only persons eligible to be qualified bidders for purposes of such proceeding." 47 U.S.C. § 309($l$). Neither party cited this provision. In any event, it would not affect our analysis because appellants have not alleged that the Commission has permitted entities who did not apply before July 1, 1997, to bid for licenses.

6. We also reject appellants' argument that the Commission departed from its own precedents in dismissing pending applications. *See* Brief for Appellants at 62–65. Prior instances

in which the Commission has adopted a new license allocation system yet processed applications pending under the old one rested on different fact-specific cost/benefits balances the Commission drew under *Maxcell*. *See* 815 F.2d at 1554; Brief for Appellee/Respondents at 20–21. In the wireless cable services order appellants cite, the Commission expressly premised its decision "on the basis of this record." 10 F.C.C.R. 9589 (1995) (para. 92). Significantly, that order involved a small number of pending applications. *Id.* at para. 89; *cf. Kessler v. FCC*, 326 F.2d 673, 686 (D.C.Cir.1963) ("Nor do we dispute the Commission's judgment in this instance that equitable considerations required or at least justified the processing of pending applications where an analysis showed that they involved potential grants not so numerous as to frustrate the ends sought in the rule making proceeding."). Similarly, in the commercial broadcast and ITFS proceedings, the Commission found that "the reopening of filing windows would certainly not expedite the disposition of the pending applications or the commencement of service to the public, but would produce further delays." 13 F.C.C.R. 15,920 (1998) (para. 108).

*See* 47 C.F.R. § 21.31(b) (1995); *but see supra* note 3 (contemplating shorter filing period under some circumstances). It later shortened the period to 30 days, explaining that "it is our practice to process applications as soon after the close of the 30-day public notice period as possible." *See* 14 F.C.C.R. at 12,430 & 12,449; *see also* 47 C.F.R. § 101.37(c) (1998) (Commission cannot grant application until 30 days after application appears on public notice).

The Communications Act, with a few exceptions not relevant here, forbids the Commission to grant an application "earlier than thirty days following issuance of public notice by the Commission of the acceptance for filing of such application or of any substantial amendment thereof." 47 U.S.C. § 309(b). The Commission reasonably determined that its ripeness period "will assure fairness to potential applicants who were precluded by the freeze from filing competing applications in time to be entitled to comparative consideration." 11 F.C.C.R. at 4989 n. 197. Had the Commission granted applications filed less than 30 days before the freeze date, it would have denied potential competing applicants the 30-day filing period the Act guarantees them.

The Supreme Court long ago recognized the procedural rights the Communications Act guarantees to those who file mutually exclusive applications. *Ashbacker Radio Corp. v. FCC*, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), held that the Commission could not grant one mutually exclusive application without holding the comparative hearing required by the Communications Act. *See also McElroy*, 86 F.3d at 253. In *Kessler v. FCC*, 326 F.2d 673 (D.C.Cir.1963), we decided that *Ashbacker* procedural rights apply also to potential applicants whose applications would have been mutually exclusive but for an application freeze. In *Kessler*, the Commission

froze applications effective close-of-business on May 10, 1962. Appellants in that case filed applications between May 11 and June 15, 1962. Some of the late applicants claimed their applications were mutually exclusive with applications on file. Unlike the present case, the Commission employed no ripeness period; it processed all applications pending on the freeze date. We held that the Commission's refusal to process mutually exclusive applications filed after the freeze but that were otherwise timely denied those applicants their *Ashbacker* rights: "those appellants who tendered applications which are, or become, in fact mutually exclusive with an application pending on May 11, 1962, or one accepted for filing since that date, are entitled to participate in a comparative hearing on that application under the *Ashbacker* case—if any grant is to be made—and [ ] the Commission may not deprive them of this right when their applications were timely but were rejected only because of a temporary freeze on accepting new applications." 326 F.2d at 687–88. We reasoned that "the substantial effect of a contrary view would be not only to freeze the acceptance for filing of a timely application but to freeze new applicants permanently out of a right of substance—the comparative hearing on the pending application to which they are entitled when their application is timely." *Id.* at 688.

*Kessler*'s reasoning applies here. Without the ripeness period, the Commission could have granted applications filed less than 30 days before the freeze date, abrogating the *Ashbacker* rights of prospective applicants who could have filed timely competing applications but for the freeze. The ripeness period quite sensibly guarantees that all applications that are granted were on public notice for the 30 days required by the Communications Act. *See* 47 U.S.C. § 309(b).[7]

7. Appellants cite the principle that *Ashbacker* "applies not to prospective applicants, but only to parties whose applications have been declared mutually exclusive." Brief for Appellants at 28 (quoting *Reuters Ltd. v. FCC*, 781 F.2d 946, 951 (D.C.Cir.1986)). We have held that not everybody interested in a telecommunications license has a right to a com-

## C. The Amendment Cut–Off

■ The Commission apparently intended the November 13, 1995, freeze to cut off amendments as well as applications. But the freeze order specified only the latter. *See* 11 F.C.C.R. 1156. Despite this oversight, the Commission, in the first Notice of Proposed Rule Making and Order it issued on December 15, 1995, stated that the November 13 freeze applied to amendments, except for a limited class of license modification amendments. *See* 11 F.C.C.R. at 4988–90. In its first Reconsideration Order, issued on January 17, 1997, the Commission changed the cut-off date for amendments of right from November 13, 1995, the application freeze date, to December 15, 1995, the date it promulgated the interim licensing procedures.[8] The Commission recognized that it was the December 15 order, not the November 13 order, that "suspended any further action on these amendments." 12 F.C.C.R. at 2918.

The amendment cut-off precluded private resolution of mutual exclusivity after December 15, 1995. It was no longer possible for amendments (or, apparently, voluntary dismissals) to cure mutual exclusivity and render an application eligible for processing under the old regime. Appellants claim they had a substantive right to cure mutual exclusivity that may not be abrogated without notice and comment. Relying on *Ashbacker*, they insist that "the right of competing applicants to simultaneous consideration under *Ashbacker* is a 'right of substance'" and that "equally of substance is an applicant's right to avoid consolidated treatment and its unintended consequences by means of conflict-resolv-

ing minor amendments and voluntary dismissals." Brief for Appellants at 46.

The "right to avoid consolidated treatment" finds no support in *Ashbacker* or any other authorities the appellants have brought to our attention. The right to amend is no more substantive than the right to file an application in the first place, which we have previously held the Commission may suspend without notice and comment. *See Kessler*, 326 F.2d at 682; *Neighborhood TV Co. v. FCC*, 742 F.2d 629, 637 (D.C.Cir.1984). Like the rules governing the filing of applications, rules permitting (or suspending) amendments are "rules of agency organization, procedure, or practice" exempt from the Administrative Procedure Act's notice and comment requirement. *See* 5 U.S.C. § 553(b)(A); *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280–82 (D.C.Cir.2000); *JEM Broad. Co. v. FCC*, 22 F.3d 320, 326–28 (D.C.Cir.1994) (FCC "hard look" rules prohibiting amendment did not require notice and comment: "we conclude that a license applicant's right to a free shot at amending its application is not so significant as to have required the FCC to conduct notice and comment rule-making, particularly in light of the Commission's weighty efficiency interests."); *Maxcell*, 815 F.2d at 1561 (stating but not deciding that a "cut-off rule arguably may be understood as an 'interpretive' rule, a rule of agency 'procedure' or of agency 'practice', any of which is exempt from the notice and comment requirements").

We also reject appellants' claim that the amendment cut-off was arbitrary and capricious.[9] Appellants' panoply of argu-

---

parative hearing, that the right inheres in those who actually file timely, mutually exclusive applications. *See Reuters,* 781 F.2d at 951. But we have also held that *Ashbacker* rights inhere in potential applicants whose right to file a timely competing application is frustrated by a Commission freeze order. *See Kessler,* 326 F.2d at 686–88. There is such a class of potential applicants in this case—those whose timely applications would be mutually exclusive with applications filed in the

30 days preceding November 13, 1995—and *Ashbacker* applies to them.

8. Commission rules at the time defined an amendment of right as an amendment that "cures a mutually exclusive situation without creating a new one." 12 F.C.C.R. at 2918; 47 C.F.R. §§ 101.29 & 101.45 (1997).

9. Contrary to appellants' assertion, the Commission provided a reasoned basis for its ac-

ments in this regard reduce to a central premise: refusal to accept amendments after December 15, 1995, "artificially preserved mutual exclusivity with respect to [39 GHz] applications, creating the fiction that applications that were mutually exclusive before December 15, 1995, remained so even after their frequency conflicts had been resolved" in violation of *Ashbacker*. Brief for Appellants at 49–50 (emphasis omitted). Appellants read *Ashbacker* far too broadly.[10] In the Court's words: "We only hold that where two *bona fide* applications are mutually exclusive the grant of one without a hearing to both deprives the loser of the opportunity which Congress chose to give him." *Ashbacker*, 326 U.S. at 333, 66 S.Ct. 148; *see also Maxcell*, 815 F.2d at 1561 ("*Ashbacker* therefore simply is irrelevant to a situation where a license applicant complains that its application was not considered due to a 'regulation' that 'for orderly administration, requires an application ... to be filed within a certain date'."); *Reuters*, 781 F.2d at 951 (criticizing an attempt to bootstrap a fairness argument onto *Ashbacker*'s narrow holding). *Ashbacker* constrains only the grant of mutually exclusive applications; it does not touch the Commission's authority to dismiss or suspend amendments of mutually exclusive applications.

## II.

Appellants contend that the Commission's treatment of their applications violated 47 U.S.C. §§ 309(j)(6)(E) and 309(j)(7). We hold the former was not violated and the latter does not apply.

### A. Section 309(j)(6)(E)

■ The Communications Act permits the Commission to adopt a system of competitive bidding to resolve mutually exclusive applications subject to "obligations described in paragraph (6)(E)." 47 U.S.C. § 309(j)(1). Paragraph (6)(E) of subsection 309(j) states that "nothing in [the subsection authorizing competitive bidding], or in the use of competitive bidding, shall be construed to relieve the Commission of the obligation in the public interest to continue to use engineering solutions, negotiation, threshold qualifications, service regulations, and other means in order to avoid mutual exclusivity in application and licensing proceedings." 47 U.S.C. § 309(j)(6)(E).

In appellants' view, subsection (j)(6)(E) requires the Commission to permit private resolution of mutual exclusivity. We think the obligation that provision imposes on the Commission in designing a competitive bidding system is something less than allowing license applicants to file applications or amend them at will under an obsolete licensing system. Subsection (j)(6)(E) affirms Congress' view that statutory competitive bidding authority does not wholesale replace "engineering solutions, negotiation ... and other means" to avoid mutual exclusivity; it does not, as appellants would have it, forbid resort to competitive bidding unless no other means to resolve mutual exclusivity are available. In *Benkelman Telephone Co. v. FCC*, 220 F.3d 601, 606 (D.C.Cir.2000), we rejected the argument that the Commission created

---

tion. The Commission adequately explained that "accepting and processing such amendments would burden Commission resources and could lead to results inconsistent with our intent in this proceeding to update the regulatory structure of the 39 GHz band in light of contemporary market conditions." 14 F.C.C.R. at 12,437–38; *see also id.* at 12,-447 (The Commission "froze new applications for 39 GHz licenses because of its concern that applications filed under the former rules may not conform to the technical and service requirements being considered. For the same reason, it froze certain amendments to

pending 39 GHz applications...."); *Maxcell*, 815 F.2d at 1555 (accepting Commission's efficiency justification for change from comparative application system to lottery).

**10.** The right to a hearing recognized in *Ashbacker* applies only in a comparative application system. *See* 47 U.S.C. § 309(a) & (e) (Communications Act hearing provision for applications to be granted on the basis of "public interest, convenience, and necessity"). It does not apply when licenses are allocated by lottery or auction. *See* 47 U.S.C. § 309(i) & (j); *McElroy*, 86 F.3d at 253 n. 5.

"artificial" mutual exclusivity in adopting a competitive bidding system: "having found the policy changes in the public interest, the Commission was authorized to implement them without regard to section 309(j)(6)(E)[,] which imposes an obligation only to minimize mutual exclusivity 'in the public interest' and 'within the framework of existing policies'." *Orion Communications Ltd. v. FCC*, 213 F.3d 761 (D.C.Cir. 2000), also refutes appellants' contention. There we held that the Commission is not required to allow bidders to use negotiated settlements to reduce mutual exclusivity; settlements may be " 'other means' of avoiding mutual exclusivity, but the statute cannot be read to direct the FCC to adopt *all* other means available." *Id.* at 763. As we stated in *DIRECTV*, "nothing in § 309(j)(6)(E) requires the FCC to adhere to a policy it deems outmoded 'in order to avoid mutual exclusivity in ... licensing proceedings'; rather, that provision instructs the agency, in order to avoid mutual exclusivity, to take certain steps, such as the use of an engineering solution, within the framework of existing policies." 110 F.3d at 828; *see also Orion*, 213 F.3d at 763; *Benkelman*, 220 F.3d at 605.

### B. Section 309(j)(7)

■ Title 47, U.S.C. § 309(j)(7) restricts consideration of the public fisc in certain of the Commission's decisions.[11] As the introductory clauses of § 309(j)(7)(A) & (B) indicate, the restriction pertains only to three types of decisions, none of which is implicated here. The covered decisions concern assignment of bands of frequencies to classes of stations under 47 U.S.C. § 303(c), development of alternative payment methods under 47 U.S.C. § 309(j)(4)(A), and area designations and bandwidth assignments under 47 U.S.C. § 309(j)(4)(C). Section 309(j)(7) does not restrict the Commission's choice of an overall license allocation mechanism.

\*    \*    \*

The Commission's dismissal of pending 39 GHz applications, use of a 30–day "ripeness" period, and imposition of an amendment cut-off date were reasonable and in accordance with law. We therefore deny the petitions for review and affirm the Commission's orders.[12]

*So ordered.*

---

**11.** Section 309(j)(7)(A) states: "In making a decision pursuant to section 303(c) of this title to assign a band of frequencies to a use for which licenses or permits will be issued pursuant to this subsection, and in prescribing regulations pursuant to paragraph 4(C) of this subsection, the Commission may not base a finding of public interest, convenience, and necessity on the expectation of Federal revenues from the use of a system of competitive bidding under this subsection." Section 309(j)(7)(B) states: "In prescribing regulations pursuant to paragraph (4)(A) of this subsection, the Commission may not base a finding of public interest, convenience, and necessity solely or predominantly on the expectation of Federal revenues from the use of a system of competitive bidding under this subsection."

**12.** We have considered appellants' other contentions and reject them.